[Crim. No. 15224. Second Dist., Div. Five. May 22, 1970.]

THE PEOPLE, Plaintiff and Respondent, v.
MARY ELIZABETH SAIDI-TABATABAI, Defendant and Appellant.

982

## COUNSEL

Joseph Amato, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Bradley A. Stoutt, Deputy Attorney General, for Plaintiff and Respondent.

## OPINION

**KAUS, P. J.**—Charged with murder of her brother-in-law Mehdi, defendant was found guilty after an extended jury trial. The murder was found to be of the second degree. This appeal presents no issue concerning the sufficiency of the evidence. The record discloses convincing circumstantial proof that defendant shot Mehdi, late at night on November 14, 1966, after lying in wait at his apartment. Her defense was that a gun which she had been carrying in her purse accidentally discharged when she fell after having been slapped by Mehdi. The gun had been bought for three dollars at a "swap meet" as a present for her father. Defendant had been told by the seller that it would not work. She had never purchased any ammunition for it.

Additional facts will be set forth wherever necessary to explain defendant's contentions on this appeal.

Defendant was arrested at her home in the early morning hours of November 15. As a result of a conversation with defendant, the police obtained the name of one Edward Eisen. Eisen was interviewed and gave extremely damaging testimony at the trial. Defendant's conversation with the police, as such, was never offered in evidence.

On November 15 defendant was again interrogated at the West Covina police station from 8:30 a.m. until about noon. During that interrogation defendant first asserted her claim of an accidental shooting; however, it differed in significant detail from her later testimony at the trial. The prosecution effectively impeached her with the statements she made on the morning of November 15. They had not been offered as part of the People's case in chief.

The trial court took extensive evidence on the voluntariness of defendant's statements and on the question whether there had been compliance with the mandate of *Miranda* v. *Arizona,* 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]. No useful purpose would be served by

setting forth the conflicting evidence offered by the parties. The court's findings and conclusions made in considerable detail, holding that defendant's statements were not obtained in violation of her constitutional rights, are amply supported by evidence. There is no question that, on the police version of the facts, defendant talked voluntarily after a knowledgeable waiver of her *Miranda* right.

A more serious question is presented by the following events: it may be inferred from the record that some of the more damaging statements which were later used to impeach defendant were made shortly before noon on November 15. At about 9:30 a.m. Detective Corby of the West Covina police received a telephone call from the attorney who eventually became defendant's trial counsel. He identified himself by name, said that he had been asked to represent defendant and wanted to know whether he could bail her out. Corby asked Captain Ryan who told him that bail would be set at the time of defendant's arraignment which would probably take place that or the next day. This information was apparently relayed to counsel who then stated that he was in Hollywood and asked whether he would be able to see defendant if he drove to West Covina. The answer was affirmative. Counsel then stated that he "might be out that afternoon." Asked for details about the case, Corby read to counsel a press release which contained the information that the police were questioning defendant. Counsel did not ask that the interrogation cease until he had a chance to confer with his client, nor did he request that defendant be advised that he was representing her.

Corby "figured" and Ryan knew that defendant was being interrogated, but neither defendant nor the officers who were doing the interrogating were told that an attorney had called on behalf of defendant.

Apparently neither Ryan nor Corby knew, or knew of, the particular attorney. Corby was not at all convinced that he was actually talking to a lawyer. He suspected that the caller might, in truth, be a reporter who was trying to get more information than was being given to the press.

Counsel arrived at the West Covina station at about noon.[1] Within a few minutes he met his client. No further statements were obtained from her.

On appeal it is claimed that as soon as the police were made aware of the fact that an attorney was interesting himself in the case on behalf of defendant, they should have discontinued the interrogation, or, at least, have informed defendant of that fact. No authority is cited for these

---

[1]The record contains conflicting evidence concerning the time of counsel's arrival. According to the defense he arrived shortly after 11 a.m. and was made to cool his heels until noon. The court's eventual ruling implies rejection of the defense version. (Evid. Code, § 402, subd. (c).)

propositions, nor have we been able to find any. The facts are, of course, quite unlike the case on which defendant principally relies, *Escobedo* v. *Illinois,* 378 U.S. 478 [12 L.Ed.2d 977, 84 S.Ct. 1758], where the arrestee's attorney personally appeared at the police station, asked to see his client— and actually did see him from a distance—but was not permitted to speak to him and where the client similarly requested permission to speak to the attorney.

Unquestionably it would have been the more "sporting" thing for the police to stop the interrogation after the receipt of the telephone call, but, as has been pointed out: "The investigation and detection of crime is not a game which one side must play according to the most rigorous standards of fair play, while no holds are barred for the other. To forbid the state to use evidence which has been illegally obtained is one thing, but to go further and bar evidence which is the result of conduct that is not illegal but merely does not measure up to the notions of fair play prevalent on the playing fields of Eton is quite another. . . ." (*People* v. *Boulad,* 235 Cal. App.2d 118, 126 [45 Cal.Rptr. 104].)

To hold that under the circumstances shown the police could not go on interrogating, would be to place legitimate investigation of crime under burdens which the Constitution surely does not demand. It must be remembered that on the evidence accepted by the trial court the defendant was fully advised of all of her rights and expressly waived them. As far as the police were concerned, counsel was just a voice on the telephone. He might not have been an attorney at all. He might have been an attorney whose interest in the matter was self-induced.[2] He did not say exactly when he intended to appear at the police station and, of course, he made no request that any interrogation cease although he was aware that defendant was being questioned. For the police to have stopped the interrogation would have meant the cessation of legitimate investigation because of a possibility which might never materialize; for them to have informed defendant that she had an attorney would not have been warranted by information which they knew to be accurate. We find no error.

■ For reasons unnecessary to relate, it became relevant whether defendant, after November 14, 1966, had had possession of certain pictures which had been in Mehdi's apartment. To prove their point, the People called defendant's husband who had received the pictures in the mail some

---

[2]It is an unfortunate fact that there are a few members of the State Bar who are so solicitous of the Sixth Amendment rights of persons accused of crime that they are willing to close an eye to canon 2 of the Rules of Professional Conduct. (52 Cal.2d 893.) We do not suggest for one moment that this is true of the attorney involved in this case, who is a gentleman of excellent reputation, well known to and respected by this court.

time after his brother's death. He testified that during his marriage with defendant he had become familiar with her handwriting. Over objection that the question called for a violation of the privilege against disclosure of confidential marital communications (Evid. Code, § 980) the husband was then permitted to testify that certain writing "that accompanied the pictures that [he] received" was in defendant's handwriting. The ruling is assigned as error. The court was correct. Assuming for the sake of argument that the contents of the writing were a confidential communication,[3] the inquiry did not call for their disclosure. The prosecutor merely wanted to know who communicated with the witness, not what was said. "It is true that . . . it is further provided in section 1881 of the Code of Civil Procedure that neither husband nor wife can, even after the termination of the marriage, be examined, without the consent of the other, as to any communication made by one to the other during the marriage. It is to be noted, however, that the point sought to be shown by the communications here in question was the act of communicating and not the nature or character of the communications themselves, the purpose of the inquiry being to show that the appellant Pusey knew the whereabouts of his wife. . . ." (*Estate of Pusey,* 180 Cal. 368, 373-374 [181 P. 648].) Every court that ever analyzed the problem has held that a spouse may identify the handwriting of the other spouse. The cases are collected in 10 A.L.R.2d 1389, 1404.

During the trial Mrs. Davies, one of the jurors, had lunch with Mrs. Barbara Warner, an attorney. According to Mrs. Warner's evidence presented to the court when its attention was drawn to the incident, Mrs. Davies said to Mrs. Warner "that's the lawyer and there's the woman that did the murders" when counsel and defendant came into the courthouse cafeteria. Mrs. Davies denied having made the statement in question. She testified that she had simply told Mrs. Warner that she was a juror in a murder trial and had pointed to defendant as the defendant in that trial. She denied having formed an opinion concerning defendant's guilt. On this conflicting evidence the court found that Mrs. Warner "probably misunderstood" what Mrs. Davies had said. It made a specific finding that Mrs. Davies' state of mind was such as to permit her to continue as a fair and impartial juror. Defendant's motion for a mistrial was denied.

Later during the trial Mrs. Davies was seen speaking to a Mrs. Love during the noon recess. Mrs. Love had just testified for defendant. Both counsel then stipulated that Mrs. Davies might be excused from further

---

[3]The record is quite murky on that point. It seems most likely that at least part of the writing which the husband identified as defendant's was the address on the package, which certainly would not be a confidential communication to the husband since, presumably, various post office employees were expected to read it.

duty; an alternate juror was put into the box. It is claimed on appeal that the motion for a mistrial was erroneously denied and that the error was not cured by Mrs. Davies' later removal because the "damage was already done." The claimed damage, presumably, is that Mrs. Davies had indeed made up her mind that defendant was guilty and, in view of her demonstrated tendency to talk too much, conveyed her feelings to the other jurors.

We find no error in denying the motion for a mistrial. The court was entitled to accept Mrs. Davies' version concerning her conversation with Mrs. Warner and to believe that she was still unbiased. The suggestion that Mrs. Davies must have engaged in improper conversations with her fellow jurors rests entirely on speculation.

■ It is claimed that counsel was ineffective within the meaning of *People* v. *Ibarra*, 60 Cal.2d 460, 464-466 [34 Cal.Rptr. 863, 386 P.2d 487], in not tendering an issue based on defendant's mental state at the time of the homicide.

Originally defendant had pleaded not guilty and not guilty by reason of insanity. Two doctors were appointed to examine her, but six days later the plea of not guilty by reason of insanity was withdrawn. The record contains no further reference to any psychiatric problems until after the jury was picked and sworn, when counsel asked for the appointment of a psychiatrist at public expense. He made it clear that the psychiatrist whom he wanted appointed, was not to report to the court but to "work with the defense in this particular case." He claimed that his client was indigent. The court asked for supporting affidavits and law on the question whether it had the power to appoint a psychiatrist on the condition counsel had in mind. Nothing further was said until the defense was well into the presentation of its case. The court then reminded counsel of the previous discussion and noted that the request for the appointment of a psychiatrist had not been renewed. Counsel stated that he was fearful that the report of any psychiatrist appointed by the court would have to be furnished to the prosecution. The court expressed doubt that this was the law and urged counsel "to make a proper request backed with points and authorities."[4]

---

[4]The court was entirely correct. (*People* v. *Vaughn*, 262 Cal.App.2d 42, 55 [68 Cal.Rptr. 366].) The Law Revision Commission comment to section 1017 of the Evidence Code, when that section was originally enacted, is misleading in that it suggests that the mere tender, by the defendant, of an issue concerning his mental condition destroys the privileged nature of a psychotherapist's report to the defendant's attorney furnished solely for the purpose of aiding counsel. Section 1017 was amended in 1967 and an addition to the comment points out that while under such circumstances the psychotherapist-patient privilege might be lost because of the patient-litigant exception stated in section 1016, the report would probably still be privileged under the lawyer-client privilege. (Evid. Code, § 954; *City & County of San Francisco* v. *Superior Court*, 37 Cal.2d 227, 234-238 [231 P.2d 26, 25 A.L.R.2d 1418].)

Later when the defense was almost about to rest, counsel asked for permission to put on "medical testimony" after the People's rebuttal. The prosecution was agreeable. Nothing was said about financial assistance in connection with this testimony. No doctor was ever called.

After the jury returned its verdict, a probation report was ordered. When completed, it strongly suggested that defendant had very definite psychiatric problems. The report had been made available to counsel when he argued a motion for a new trial. He stated that the probation report disclosed something of which he "should have been possibly more fully aware" and that a "psychiatric evaluation might have been helpful if presented to the jury in this particular case to go to the matter of intent or the diminished capacity on the matter of intent." He admitted that while the fact that defendant had emotional problems came as no surprise to him, the degree of her problems did. The court reminded counsel that he had failed to pursue his initial request for the appointment of a psychiatrist. Counsel declared that he had not followed up because, right or wrong, he had come to the conclusion that the prosecution would be entitled to a copy of any report. The court then, "as a matter of fairness," did order a psychiatric examination of defendant. Doctor George Thompson was appointed. He examined defendant and, in due course, reported his finding that "[a]t the time of the commission of the offense, [defendant] was suffering from a mental illness which, in the opinion of the examiner, diminished her capacity to form the intent to kill, to deliberate, to premeditate, and to harbor malice." She was, however, sane at the time of the examination and had been "possibly sane under the McNaughton test" at the time of the offense. His diagnosis was: "Psychoneurosis, anxiety state with superimposed psychoneurotic depression. Also superimposed reactive depression."

At a renewed hearing on defendant's motion for a new trial counsel strenuously argued his own incompetence in not putting defendant's mental state in issue. The motion was denied.

We are not sympathetic to *mea culpas* from defense counsel on motions for new trials. (Cf. *People* v. *Cuevas,* 250 Cal.App.2d 901, 907 [59 Cal. Rptr. 6].) In the case at bar it is apparent from the initial plea of not guilty by reason of insanity, that the problem of defendant's mental state had never been very far from counsel's mind. As a matter of trial strategy, a defense of diminished capacity to harbor malice does not mix too well with a claim of accidental shooting. The court was not required to accept, at face value, counsel's protestations of incompetence. A direct appeal, where the appellate court knows only what transpires in the courtroom is a poor

vehicle for the assertion of a claim of incompetence except in the clearest of cases, such as *Ibarra*. We find no error on this record.[5]

The judgment is affirmed.

Stephens, J., and Aiso, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied July 16, 1970. Peters, J., was of the opinion that the petition should be granted.

---

[5]In discussing Doctor Thompson's report, the trial court pointed out that in view of the verdict finding defendant guilty of murder of the second degree, the question of deliberation and premeditation had become academic. It then voiced the opinion that in view of all of the evidence the jury would have reached the same verdict even had Doctor Thompson's opinion been put before it. In so finding the court possibly went further than it had to. All it really knew after receiving Doctor Thompson's report was that there was one psychiatrist who was willing to find that defendant's mental problems, known to counsel at the very outset, were such that at the time of the commission of the offense her capacity to harbor malice was impaired to some extent. The trial court would have been well justified in taking into account the probability, if not certainty, that the prosecution would have been able to marshal contrary evidence.