[Crim. No. 17898. In Bank. Feb. 14, 1975.]

THE PEOPLE, Plaintiff and Respondent, v.
RICHARD LEE LINES, Defendant and Appellant.

502

## COUNSEL

David E. Kenner, under appointment by the Supreme Court, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Norman H. Sokolow and James H. Kline, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**SULLIVAN, J.**—Defendant Richard Lee Lines was charged by information with the murder of his aunt, Rose Ethyl Hunt. He entered pleas of not guilty and not guilty by reason of insanity. After a bifurcated trial, a jury found defendant guilty of murder in the second degree and sane at the time the offense was committed.[1] Defendant was sentenced to imprisonment for the term prescribed by law. He appeals from the judgment of conviction.

On November 24, 1971, about 1 a.m., defendant went to a Los Angeles police station and informed the officer in charge that he had shot his aunt, Rose Hunt, in whose home he had been living. He handed the officer his jacket which contained a .38 caliber revolver and some ammunition. The police proceeded to the Hunt residence where they discovered the victim's body lying on the floor of her bedroom. She had been shot five times.

After advising defendant of his *Miranda* rights (*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]) the

---

[1]After the trial commenced defendant was found presently insane pursuant to section 1368 of the Penal Code. The court suspended the criminal proceedings and committed defendant to Atascadero State Hospital. Four months later, having found that defendant had regained his sanity, the court reinstated the criminal proceedings.

police interrogated him at a tape-recorded interview. Defendant generally explained his conduct by giving them an account of a plot to murder his friend Jim McEver. He stated that his uncle, Edward Hunt, solicited defendant's aid in killing McEver who had acted improperly toward Hunt's daughter. According to the plan, defendant was to take McEver to a tavern for a drink and at a prearranged time was to inveigle the latter into going outside, where he would be shot.

According to defendant, he then informed McEver of the plot. On the afternoon preceding the murder, both men went to the police station where they related the details of the murder plan. They were advised to pretend to proceed with the plot so that the identity of all participants could be uncovered. That evening defendant engaged in drinking with McEver for about two hours and then returned home. An argument arose between defendant and the Hunts concerning the murder plan. Confused and upset over the altercation defendant was unable to sleep and decided to return to the police station with the gun which his aunt had purchased to kill McEver. As he was leaving the house, he went to his aunt's bedroom and an argument ensued. She started out of bed towards him, "everything exploded in [his] head" and he shot her.[2] After the shooting, defendant dropped the empty cartridges in the street, reloaded the gun, stopped off at a bar looking for McEver and then proceeded to the police station.

Defendant stated several times during the interrogation that he had no intention of killing his aunt, that he was upset and confused, and that he was afraid of his aunt when she advanced toward him. He also stated that he had had serious mental problems in the past.

On their case in chief during the guilt phase, the People introduced defendant's tape-recorded statements into evidence and played the tape to the jury. Defendant took the stand in his own behalf. However, he then testified that he was in no way involved with the killing, that his uncle had killed his aunt, and that he had confessed in order to cover up for his uncle.

Before considering the main issue presented by this appeal, we must initially dispose of two preliminary contentions. First, defendant

---

[2]According to defendant's statement, he told his aunt that he was going to turn everyone in to the police. "And she said, give me my gun, and I said you just stay right there where you're at. She jumped up out of the bed and started to charge and all I remember is a bang, bang, bang. . . . [¶] Started like in a run toward me and everything exploded in my head and that's all I know."

contends that the court erred in denying his motion for a judgment of acquittal made pursuant to Penal Code section 1118.1[3] at the close of the People's case in chief during the guilt phase of the trial.[4] It has been said that the "test to be applied by the trial court under the section is, therefore, the same test applied by an appellate court in reviewing a conviction: whether from the evidence, including reasonable inferences to be drawn therefrom, there is any substantial evidence of the existence of each element of the offense charged [citations]." (*People* v. *Valerio* (1970) 13 Cal.App.3d 912, 919 [92 Cal.Rptr. 82]; see also *People* v. *Lawrence* (1972) 25 Cal.App.3d 213, 221 [101 Cal.Rptr. 671].) Defendant argues that the prosecution failed to prove malice, which is a necessary element in the offense of second degree murder. (Pen. Code, §§ 187, 189.) We consider defendant's argument on the basis of the evidence in the record at the time his motion was made.

He premises his argument upon *People* v. *Collins* (1961) 189 Cal.App.2d 575, 591 [11 Cal.Rptr. 504], which held that: "[t]he prosecution, having presented as a part of its case the statement of defendant as to how the killing occurred, is bound by that evidence in the absence of proof to the contrary." It is urged that the prosecution failed to establish malice since defendant's tape-recorded statement which the prosecution introduced in evidence precluded any finding of implied malice and there is no evidence to the contrary.

While it is true that defendant's statement in large part might preclude a finding of malice, there is in the record ample evidence to the contrary supportive of a finding of implied malice. ■ It is settled that the necessary element of malice may be inferred from the circumstances of the homicide. (*Jackson* v. *Superior Court* (1965) 62 Cal.2d 521, 525 [42

---

[3]Added to the Penal Code in 1967 and replacing the procedure under former section 1118 providing for the court's nonbinding advice to the jury to acquit, section 1118.1 provides: "In a case tried before a jury, the court on motion of the defendant or on its own motion, at the close of the evidence on either side and before the case is submitted to the jury for decision, shall order the entry of a judgment of acquittal of one or more of the offenses charged in the accusatory pleading if the evidence then before the court is insufficient to sustain a conviction of such offense or offenses on appeal. If such a motion for judgment of acquittal at the close of the evidence offered by the prosecution is not granted, the defendant may offer evidence without first having reserved that right."

[4]The record discloses that although defendant moved for a judgment of acquittal under section 1118.1, he stated additionally that the court should "only allow the jury to hear the charges of manslaughter." His argument before us is that the court erred in denying his motion to reduce the charge from murder to manslaughter. Since his motion under section 1118.1 was denied we limit our review to the merits of the denial and need not concern ourselves with the procedural nicety as to whether the section permits a motion to "reduce" the charge. (See *People* v. *Odom* (1970) 3 Cal.App.3d 559, 561 [83 Cal.Rptr. 520].)

Cal.Rptr. 838, 399 P.2d 374]). "Such malice may be express or implied. . . . It is implied, when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." (Pen. Code, § 188.) Thus this court has declared that "[w]hen the killing is proved to have been committed by the defendant, and nothing further is shown, the presumption of law is that it was malicious and an act of murder; but in such a case the verdict should be murder of the second degree, and not murder of the first degree. [Citations.]" (*People* v. *Howard* (1930) 211 Cal. 322, 329 [295 P. 333, 71 A.L.R. 1385]; see also *People* v. *Wells* (1938) 10 Cal.2d 610, 616-617 [76 P.2d 493].) Accordingly, in *Jackson* v. *Superior Court, supra,* we pointed out that when it is proved that the defendant assaulted the victim with a deadly weapon in a manner endangering life and resulting in death, " 'malice is implied from such assault in the absence of justifying or mitigating circumstances.' " (62 Cal.2d at p. 526.)

 In the case at bench defendant shot a frail 57-year-old woman five times with a revolver while the unarmed victim was getting out of her bed four feet away from him. These facts fully support a finding of implied malice. We are satisfied the trial court did not err in denying defendant's motion to reduce the offense charged from second degree murder to manslaughter.

 Defendant next contends that the court erred in denying his motion, made in connection with his motion for a new trial, to modify the verdict by reducing it from second degree murder to manslaughter.[5] He argues that the psychiatric evidence introduced during the sanity phase of the trial established his diminished capacity so as to negate malice. However, evidence of diminished capacity must be introduced during the guilt phase of the trial in order to be considered on a motion pursuant to section 1181, subdivision 6, to reduce a verdict from second degree murder to manslaughter. If such evidence is introduced only in the sanity or penalty phase of the trial it cannot be considered in reduction of the previously rendered verdict of guilty.

---

[5] Penal Code section 1181 provides in relevant part:
"When a verdict has been rendered or a finding made against the defendant, the court may, upon his application, grant a new trial, in the following cases only:
". . . . . . . . . . . . .
"6. When the verdict or finding is contrary to law or evidence, but if the evidence shows the defendant to be not guilty of the degree of the crime of which he was convicted, but guilty of a lesser degree thereof, or of a lesser crime included therein, the court may modify the verdict, finding or judgment accordingly without granting or ordering a new trial, and this power shall extend to any court to which the cause may be appealed."

(*People* v. *Lookadoo* (1967) 66 Cal.2d 307, 316 [57 Cal.Rptr. 608, 425 P.2d 208]; see *People* v. *McDowell* (1968) 69 Cal.2d 737 [73 Cal.Rptr. 1, 447 P.2d 97]; *People* v. *Henderson* (1963) 60 Cal.2d 482, 490-491 [35 Cal.Rptr. 77, 386 P.2d 677].) **(3b)** At the trial on the issue of guilt defendant presented no diminished capacity evidence. His sole defense was that his uncle, and not he, had committed the homicide. ■ The decision whether to present evidence on the issue of diminished capacity at the trial on the issue of guilt or to reserve such evidence solely for presentation at the sanity or penalty phase of the trial is a matter of trial tactics and is a binding decision, subject to attack only if the decision resulted from professional incompetence. (*People* v. *McDowell, supra,* 69 Cal.2d 737, 751 and cases there cited.) ■ We conclude that the trial court properly denied the motion.

■ We now direct our attention to the central contention urged by defendant on this appeal, namely that it was error for the trial court to admit the testimony of two court-appointed psychotherapists over defendant's objection that such testimony would violate his attorney-client privilege.

Several psychiatrists were appointed by the court at various stages in the proceeding to examine defendant's mental condition. As will appear, defendant objected to the admission of the testimony of two of these, Doctors Markman and Abe.

The information was filed on December 17, 1971. On December 27, 1971, defendant entered a plea of not guilty. On January 25, 1972, on defendant's motion the court appointed pursuant to sections 730[6] and 1017[7] of the Evidence Code, Doctors Tweed and Markman to examine

---

[6]Section 730 provides: "When it appears to the court, at any time before or during the trial of an action, that expert evidence is or may be required by the court or by any party to the action, the court on its own motion or on motion of any party may appoint one or more experts to investigate, to render a report as may be ordered by the court, and to testify as an expert at the trial of the action relative to the fact or matter as to which such expert evidence is or may be required. The court may fix the compensation for such services, if any, rendered by any person appointed under this section, in addition to any service as a witness, at such amount as seems reasonable to the court."

Hereafter, unless otherwise indicated, all section references are to the Evidence Code.

[7]Section 1017 provides: "There is no privilege under this article if the psychotherapist is appointed by order of a court to examine the patient, but this exception does not apply where the psychotherapist is appointed by order of the court upon the request of the lawyer for the defendant in a criminal proceeding in order to provide the lawyer with information needed so that he may advise the defendant whether to enter or withdraw a plea based on insanity or to present a defense based on his mental or emotional condition."

defendant. On April 17, 1972, defendant entered a plea of not guilty by reason of insanity and the court thereupon pursuant to section 1026 et seq. of the Penal Code and section 730 of the Evidence Code appointed Doctor Bielinski "to examine deft," and "reappointed" Doctors Markman and Tweed "previously appointed . . . to examine deft. and report to the court . . . ."[8]

On May 23, 1972, the case was called for trial. On May 30, 1972, the record discloses that the court made inquiries as to whether defendant understood the nature of the proceedings and of the charges, and as to whether he could cooperate rationally with his counsel. On May 31, 1972, the court declared that based on observing defendant's conduct, it had a doubt as to whether or not defendant understood the nature of the proceedings and could cooperate rationally with counsel in his defense. The court thereupon suspended the criminal proceedings and on its own motion, under section 730, appointed Doctors Coleman and Markman to examine defendant. On June 5, 1972, having pursuant to stipulation read and considered the reports of Doctors Markman, Tweed and Coleman, the court found defendant insane within the meaning of section 1368 of the Penal Code, suspended the criminal proceedings and ordered defendant committed to the Department of Mental Hygiene for placement in Atascadero State Hospital.

On October 4, 1972, criminal proceedings were resumed and defen-

[8]Penal Code section 1027 provides: "When a defendant pleads not guilty by reason of insanity the court must select and appoint two, and may select and appoint three, psychiatrists to examine the defendant and investigate his sanity. It is the duty of the psychiatrists so selected and appointed to examine the defendant and investigate his insanity, and to testify, whenever summoned, in any proceeding in which the sanity of the defendant is in question. Said psychiatrists so appointed by the court shall be allowed, in addition to their actual traveling expenses, such fees as in the discretion of the court seems just and reasonable, having regard to the services rendered by the witnesses. The fees allowed shall be paid by the county where the indictment was found or in which the defendant was held for trial.

"Nothing contained in this section shall be deemed or construed to prevent any party to any criminal action from producing any other expert evidence as to the sanity of the defendant; where expert witnesses are called by the district attorney in such action, they shall only be entitled to such witness fees as may be allowed by the court.

"Any psychiatrist so appointed by the court may be called by either party to the action or by the court itself and when so called shall be subject to all legal objections as to competency and bias and as to qualifications as an expert. When called by the court, or by either party, to the action, the court may examine the psychiatrist, as deemed necessary, but either party shall have the same right to object to the questions asked by the court and the evidence adduced as though the psychiatrist were a witness for the adverse party. When the psychiatrist is called and examined by the court the parties may cross-examine him in the order directed by the court. When called by either party to the action the adverse party may examine him the same as in the case of any other witness called by such party."

dant was "re-arraigned." On November 1, 1972, defendant entered pleas of not guilty and not guilty by reason of insanity. At that time Doctors Walter and Abe were appointed "under Sections 730 and 1017 of the Evidence Code to examine defendant and prepare confidential reports."

At the sanity phase, defendant called only one witness—Doctor Coleman—and then rested. The People called Doctors Abe and Markman, as well as Doctors Walter and Tweed. When Doctor Abe was called, defendant objected on the ground that his testimony would reveal confidential communications protected by the attorney-client privilege. Thereafter when Doctor Markman was called defendant objected to the admission of his testimony insofar as it was based on the first two examinations of defendant on the ground the information gained from these examinations constituted confidential communications protected by the attorney-client privilege.[9]

The attorney-client privilege enables a client to prevent disclosure of confidential communications between himself and his attorney, i.e., information transmitted in confidence between a client and his attorney in the course of the attorney-client relationship. (§§ 952, 954.)[10] Confidentiality is not destroyed by disclosure of these communications to

[9]Defendant did not object to the testimony of Doctor Markman insofar as it consisted of the results of his examination to determine defendant's present mental capacity to stand trial pursuant to the May 31, 1972, appointment.

[10]Section 954 provides: "Subject to Section 912 and except as otherwise provided in this article, the client, whether or not a party, has a privilege to refuse to disclose, and to prevent another from disclosing, a confidential communication between client and lawyer if the privilege is claimed by:

"(a) The holder of the privilege;

"(b) A person who is authorized to claim the privilege by the holder of the privilege; or

"(c) The person who was the lawyer at the time of the confidential communication, but such person may not claim the privilege if there is no holder of the privilege in existence or if he is otherwise instructed by a person authorized to permit disclosure.

"The relationship of attorney and client shall exist between a law corporation as defined in Article 10 (commencing with Section 6160) of Chapter 4 of Division 3 of the Business and Professions Code and the persons to whom it renders professional services, as well as between such persons and members of the State Bar employed by such corporation to render services to such persons. The word 'persons' as used in this subdivision includes partnerships, corporations, associations and other groups and entities."

Section 952 provides: "As used in this article, 'confidential communication between client and lawyer' means information transmitted between a client and his lawyer in the course of that relationship and in confidence by a means which, so far as the client is aware, discloses the information to no third persons other than those who are present to further the interest of the client in the consultation or those to whom disclosure is reasonably necessary for the transmission of the information or the accomplishment of the purpose for which the lawyer is consulted, and includes a legal opinion formed and the advice given by the lawyer in the course of that relationship."

third persons "to whom disclosure is reasonably necessary for . . . the accomplishment of the purpose for which the lawyer is consulted." (§ 952.) The Law Revision Commission comment to section 952 states that section 952 includes confidential communications made by the client to a physician for the purpose of transmitting such information to the attorney and indicates that this rule codifies the existing law as stated in *City & County of S.F.* v. *Superior Court* (1951) 37 Cal.2d 227 [231 P.2d 26, 25 A.L.R.2d 1418].

In the last mentioned case, the plaintiff brought an action for damages for personal injuries claiming brain concussion, nerve root damage and nervous shock. The plaintiff's attorney employed Dr. Catton, a physician specializing in nervous and mental diseases, to give the plaintiff a neurological and psychiatric examination for the purpose of informing such attorney as to the plaintiff's mental and physical condition. Later, when defendant's counsel attempted to take Dr. Catton's deposition, the latter refused to answer questions regarding plaintiff's condition on the ground that the information sought was privileged. The court held that Dr. Catton was an intermediary agent for communication between the plaintiff and his attorney and that therefore these communications were protected from disclosure by the attorney-client privilege: "Thus, when communication by a client to his attorney regarding his physical or mental condition requires the assistance of a physician to interpret the client's condition to the attorney, the client may submit to an examination by the physician without fear that the latter will be compelled to reveal the information disclosed." (*City & County of S.F.* v. *Superior Court, supra,* 37 Cal.2d 227, 237; see *Jones* v. *Superior Court* (1962) 58 Cal.2d 56, 60-61 [22 Cal.Rptr. 879, 372 P.2d 919, 96 A.L.R.2d 1213]; *In re Ochse* (1951) 38 Cal.2d 230 [238 P.2d 561].)

In the case at bench, Doctors Abe and Markman were appointed by the court for the purpose of examining defendant for his own benefit and of fully informing his counsel as to the nature and extent of defendant's mental condition to the end of assisting counsel in the preparation and presentation of a defense. What this arrangement amounted to in effect was that defendant, through the doctor as an intermediate agent, communicated to his attorney information as to his mental condition. To put it another way, all information obtained by the doctors from their examination of defendant and the reports thereof furnished to his attorney constituted confidential communications protected from disclosure by the attorney-client privilege. The fact that the psychiatrists were appointed by the court rather than privately employed by counsel in no

way affects the confidentiality of these communications since they were appointed to prepare a confidential report for defendant.[11]

The People apparently concede that these communications from Dr. Abe and Dr. Markman were originally protected by the attorney-client privilege but argue that they ceased to be so once defendant tendered the issue of his mental condition by pleading not guilty by reason of insanity. Under the patient-litigant exception to the physician-patient privilege "[t]here is no privilege . . . as to a communication relevant to an issue concerning the condition of the patient if such issue has been tendered by . . . [t]he patient . . . ." (§ 996.) Similarly under the patient-litigant exception to the psychotherapist-patient privilege, "[t]here is no privilege . . . as to a communication relevant to an issue concerning the mental or emotional condition of the patient if such issue has been tendered by . . . [t]he patient . . . ." (§ 1016.) But there is no statutory client-litigant exception to the attorney-client privilege (see §§ 950-962). Indeed this court has expressly so held, declaring that when communications by a client to his attorney regarding his physical or mental condition require the assistance of a physician to interpret the client's condition to the attorney, the information obtained by the physician as a result remains protected from disclosure even if the client places his physical or mental condition in issue. (*City & County of S.F.* v. *Superior Court, supra,* 37 Cal.2d 227, 237-238.)[12]

The People, conveniently ignoring both the absence of a client-litigant exception to the attorney-client privilege (§§ 950-962) and our holding in *City & County of S.F.,* seek to create such an exception by reference to the statutory provisions governing the psychotherapist-patient privilege (§§ 1010-1026). Generally speaking there is no psychotherapist-patient privilege if the psychotherapist is appointed by order of a court to examine the patient, except where "the psychotherapist is appointed by order of the court upon the request of the lawyer for the defendant in a criminal proceeding in order to provide the lawyer with information needed so that he may advise the defendant whether to enter or

---

[11]A different situation obtains where the psychiatrist is appointed by the court to prepare a report for the court (see fn. 8, *ante*). These communications would not be protected by the attorney-client privilege because they are not made to the attorney at the attorney's request for purposes in furtherance of the attorney-client relationship.

[12]The court in *City & County of S.F.* at page 238 indicated that if the physician were hired to treat the defendant, then, since he was not employed to interpret the defendant's condition to his attorney and the attorney-client privilege did not arise, the patient-litigant exception to the physician-patient privilege would control and the physician's communications would not be privileged once the patient tendered the issue of his physical or mental condition.

withdraw a plea based on insanity or to present a defense based on his mental or emotional condition." (§ 1017, see fn. 7, *ante.)* As a consequence, the psychotherapist-patient privilege applies to protect information provided an attorney by a court-appointed psychotherapist in such circumstances. As we have already explained, such information is also protected from disclosure by the attorney-client privilege.

However, once the patient places his mental or emotional condition in issue, as for example by pleading not guilty by reason of insanity, the information so provided by the psychotherapist to the attorney is no longer protected from disclosure by the psychotherapist-patient privilege. (§ 1016.)[13] The Law Revision Commission comment to the 1967 amendment of section 1017 states: "It is important to recognize that the attorney-client privilege may provide protection in some cases where an exception to the psychotherapist-patient privilege is applicable. See section 952 and the *Comment* thereto. See also sections 912(d) and 954 and the *Comments* thereto."

The People relying on *People* v. *Aikin* (1971) 19 Cal.App.3d 685 [97 Cal.Rptr. 251], argue that where, as in the case before us, a psychotherapist appointed by the court to provide confidential information concerning the defendant's mental condition to the latter's attorney has not been called as a defense witness after the defendant has placed his mental condition in issue, such situation is not one falling within the above comment of the Law Revision Commission and the attorney-client privilege does not remain effective. In *Aikin,* the court, noting that the comment to section 1017 indicates a continuance of the attorney-client privilege in "some cases," and reviewing the commission's comments to sections 912, subdivision (d), 952 and 954 (referred to in the comment to § 1017) concluded that "the attorney-client privilege pertinent to the client's revelations to the psychotherapist and the latter's diagnosis which is passed on to the lawyer so that he can advise his client on whether to present a defense based on emotional status goes only to the advice area and ends if the client and his lawyer go beyond that stage and decide to present the defense." (*Id.,* at pp. 696-697.) The sole authority offered by the court to support this startling proposition is the following language quoted from the Law Revision Commission comment to section 952:

[13]Section 1016 provides: "There is no privilege under this article as to a communication relevant to an issue concerning the mental or emotional condition of the patient if such issue has been tendered by: [¶] (a) The patient; [¶] (b) Any party claiming through or under the patient; [¶] (c) Any party claiming as a beneficiary of the patient through a contract to which the patient is or was a party; or [¶] (d) The plaintiff in an action brought under Section 376 or 377 of the Code of Civil Procedure for damages for the injury or death of the patient."

" '[a] lawyer at times may desire to have a client reveal information to an expert consultant [e.g., to a psychotherapist appointed by the court to advise on diminished capacity defense; see section 1017] in order that the lawyer may adequately *advise his client* . . . .' " (*Id.*, at p. 696; italics added.) The court fastened upon the italicized words and inferred from them that the attorney-client privilege as applied to confidential psychotherapist reports ends once the attorney has advised the client and tendered a defense based on defendant's emotional condition.

The *Aikin* court totally overlooked our holding in *City & County of S.F.* that there is no client-litigant exception to the attorney-client privilege so that where the physician is an intermediate agent to inform defendant's counsel as to defendant's mental condition, the communications from the physician to counsel are still protected by the attorney-client privilege even after the client has put his mental or physical condition in issue. (*City & County of S.F.* v. *Superior Court, supra,* 37 Cal.2d 227, 237-238.)[14] The Courts of Appeal have recognized that the attorney-client privilege will thus operate to preserve the confidentiality of communications to the defendant's lawyer from a psychotherapist appointed by the court pursuant to section 1017, despite the fact that the defendant's plea of not guilty by reason of insanity has rendered inoperative the psychotherapist-patient privilege. (*Finley* v. *Superior Court* (1972) 29 Cal.App.3d 342, 347-348 [104 Cal.Rptr. 699]; *People* v. *Goldbach* (1972) 27 Cal.App.3d 563, 568 [103 Cal.Rptr. 800]; *People* v. *Saidi-Tabatabai* (1970) 7 Cal.App.3d 981, 987 [86 Cal.Rptr. 866].)[15]

[14]The comment to section 952 relied upon in *Aikin* specifically states that section 952 codifies existing law as stated in *City & County of S.F.*

[15]In *People* v. *Saidi-Tabatabai, supra,* 7 Cal.App.3d 981, 987, footnote 4, the court stated: "The Law Revision Commission comment to section 1017 of the Evidence Code, when that section was originally enacted, is misleading in that it suggests that the mere tender, by the defendant of an issue concerning his mental condition destroys the privileged nature of a psychotherapist's report to the defendant's attorney furnished solely for the purpose of aiding counsel. Section 1017 was amended in 1967 and an addition to the comment points out that while under such circumstances the psychotherapist-patient privilege might be lost because of the patient-litigant exception stated in section 1016, the report would probably still be privileged under the lawyer-client privilege. (Evid. Code, § 954; *City & County of San Francisco* v. *Superior Court [supra]* 37 Cal.2d 227, 234-238 . . . .)"

In *People* v. *Goldbach, supra,* 27 Cal.App.3d 563, 568, the court explicitly recognized that the attorney-client privilege applied in this circumstance: "While Evidence Code section 1016 states: 'There is no [psychotherapist-patient] privilege . . . as to a communication relevant to an issue concerning the mental or emotional condition of the patient if such issue has been tendered by: (a) The patient; . . .' [I]t does not require disclosure of communications to a psychiatrist appointed pursuant to section 1017 who acts purely as a consultant to defense counsel and who is not called as a witness. Those communications are protected by the attorney-client privilege codified in Evidence Code section 954. That privilege extends to communications between the lawyer and client which are disclosed to third persons who are present to further the interest of the client

We reaffirm our holding in *City & County of S.F.* to the effect that there is no client-litigant exception to the attorney-client privilege. Therefore where, as here, pursuant to section 1017 of the Evidence Code a psychotherapist is appointed by the court in a criminal proceeding to examine the defendant in order to provide the defendant's attorney with information for the purposes set forth in said section, the results of such examination, including any report thereof, and all information and communications relating thereto, are protected from disclosure by the attorney-client privilege notwithstanding the fact that the defendant has theretofore or thereafter tendered in said proceeding the issue of his mental or emotional condition. Anything to the contrary in *People* v. *Aikin, supra,* 19 Cal.App.3d 685, is disapproved.

The record in the instant case reveals that Doctor Markman was initially appointed by the court to examine defendant by order made on January 25, 1972, pursuant to sections 730 and 1017 on motion of defendant. The results and any report of such examination and all information and communications relating thereto were permanently protected by the attorney-client privilege unless such privilege was waived. However on April 17, 1972, upon defendant's entering a plea of not guilty by reason of insanity, Doctor Markman (again along with Doctor Tweed) was reappointed to examine defendant and report to the court by a given date. As noted previously, this reappointment was made at the same time that Doctor Bielinski was appointed to examine defendant. We set forth below the entire order which in longhand appears immediately after the checked printed portion of the sheet reading "Further order as follows."[16]

It thus appears that in the single sentence set forth above, the court appointed three psychiatrists pursuant to Penal Code section 1027, two of whom, Doctors Markman and Tweed, had been appointed on January 25, not pursuant to Penal Code section 1027 but pursuant to Evidence Code section 1017. When a defendant pleads not guilty by reason of

---

or to whom disclosure is reasonably necessary for transmission of the information to the lawyer. (Evid. Code, § 952.) Accordingly, it covers communications made to 'a physician or similar expert—for the purpose of transmitting such information to the lawyer. . . .' (Law Revision Commission comment on Evid. Code, § 952; *City & County of S.F.* v. *Superior Court* [*supra*] 37 Cal.2d 227, 234-235 . . . .) Sections 1016 and 1017 thus preserve to the indigent defendant the same right to confidentiality of the psychiatric expert consultant that is available to a defendant employing a privately retained psychiatrist not called by him as a witness. His lawyer need merely request the appointment for consultation purposes."

 [16]"*Deft. pleads not guilty by reason of insanity.* Pursuant to 1026 et seq. PC & 730 EC Dr. Bielinski is appointed to examine deft. and Drs. Markman & Tweed previously appointed are re-appointed (in light of new evidence by Deft.) to examine deft. & report to the court by 5/16/72."

insanity, the court is required to appoint two psychiatrists to examine defendant and investigate his sanity; these psychiatrists may be called to testify by either party or the court. (Pen. Code, § 1027, see fn. 8, *ante.*) The information gained from these examinations and communicated to the court, either by written medical report or in court testimony of the psychiatrist called as a witness by either party or by the court itself is clearly not protected by the attorney-client privilege. The psychiatrists so appointed are not appointed as agents of the attorney, but of the court; the communications are not made in confidence and are not made to the attorney. Therefore, the trial court did not err in allowing Doctor Markman to testify as to the results of his examination of defendant pursuant to his reappointment under section 1027 of the Penal Code. However, the results of the initial examination pursuant to section 1017 and communications thereof to defendant's attorney are, as stated earlier, protected by the attorney-client privilege. They are still protected by this privilege (see *City & County of S.F.* v. *Superior Court, supra,* 37 Cal.2d 227, 238)[17] and thus the trial court erred in admitting over defendant's objection Doctor Markman's testimony as to the results of the first examination and his reports to defendant's attorney.

Although we. have concluded that information relating to Doctor Markman's first examination of defendant under the January 25 order is privileged while that relating to his examination under the April 17 order is not, we can conceive of situations where such information cannot be so

[17]In *City & County of S.F.* this court noted that if a physician is employed to treat a patient rather than as an intermediary to interpret defendant's condition to the patient's attorney, then the results of such examination are protected by the physician-patient privilege but not by the attorney-client privilege. In that situation, once the patient tenders his physical or mental condition in issue, the results of such examination are no longer protected because of the statutory patient-litigant exception. (§ 996.) This court explored the effect of the interaction of the physician-patient privilege and attorney-client privilege where the same physician is appointed at different times both to treat the patient and as agent of attorney to interpret his physical condition: "Had Dr. Catton treated Hession before being asked to serve as an intermediate agent between Hession and his attorneys, the patient-litigant exception would apply and Dr. Catton would then have been like any other witness with knowledge of facts pertinent to an issue to be tried. The exception could not be defeated by asking the physician to reveal his knowledge of the facts to the attorneys, for a litigant cannot silence a witness by having him reveal his knowledge to the litigant's attorney. (See *Hickman* v. *Taylor,* 329 U.S. 495, 506-509 . . . ; 8 Wigmore . . . §§ 2317-2318, pp. 615-618; 58 Am.Jur., Witnesses, § 498, pp. 279-280.) Similarly, if Dr. Catton should now treat Hession, any information acquired in the course of that treatment would not be privileged, although the results of his previous examinations and his reports to Hession's attorneys would be." (*City & County of S.F.* v. *Superior Court, supra,* 37 Cal.2d 227, 238.) Similarly in the case at bench the results and reports of the first examination are still protected by the attorney-client privilege, while the results and reports of the second examination pursuant to section 1027 of the Penal Code, which were never protected by the attorney-client privilege, are also not protected by the psychotherapist-patient privilege (§§ 1016, 1017) and therefore admissible at trial.

precisely compartmentalized and where it may be an impossible task for the psychiatrist to report or testify as to unprivileged information without drawing upon and utilizing that which is privileged. In view of the conclusion we reach in this case, we deem it unnecessary to discuss these ramifications as they may pertain to Doctor Markman. However in view of the risk of disclosure of privileged information, we seriously question the wisdom of "reappointing" without appropriate waiver by the defendant a psychiatrist, whose earlier examination is protected by privilege, to make a subsequent examination under circumstances which carry no protection of privilege, and accordingly we disapprove of such practice.

We turn to the evidence admitted which arose out of Doctor Abe's examination of defendant. The record reveals that Doctor Abe was appointed by the court "under sections 730 and 1017 of the Evidence Code to examine defendant and prepare confidential report." The results of and all communications relating to such examination made in confidence by Doctor Abe to defendant's counsel were permanently protected from disclosure by the attorney-client privilege unless the protection was waived. We conclude, therefore, that the trial court erred in admitting over defendant's objection Doctor Abe's testimony revealing the contents of these confidential communications.

■ Nevertheless we do not believe that the admission of the testimony of Doctors Abe and Markman, although error, was prejudicial to defendant. Their testimony was essentially the same as that of Doctors Walter and Tweed who testified, without objection by the defense, as to defendant's sanity. Defendant has failed to point out to us anything different or particularly prejudicial to him in the testimony of Doctors Abe and Markman. After an examination of the entire cause, including the evidence, it does not appear to us to be reasonably probable that a result more favorable to defendant would have been reached in the absence of the above error. We cannot say that there has been a miscarriage of justice. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]; Cal. Const., art. VI, § 13.)[18]

---

[18]Defendant's final contention is that the trial court erred in refusing to take judicial notice of its minute order of June 5, 1972, declaring defendant incompetent to stand trial. This had been requested by defendant in order to rebut the testimony of the bailiff at the first trial which implied that defendant was feigning incompetence to stand trial. The court correctly noted that the legal standards for determining present sanity under section 1368 of the Penal Code (see *People* v. *Perry* (1939) 14 Cal.2d 387, 399 [94 P.2d 559, 124 A.L.R. 1123]) are different from those for determining the issue of sanity raised by the plea of not guilty by reason of insanity (see *People* v. *Wolff* (1964) 61 Cal.2d 795, 799-803 [40 Cal.Rptr. 271, 394 P.2d 959]). The fact that defendant was previously found incompetent to stand trial is irrelevant to the issues presented at the sanity phase of the

The judgment is affirmed.

Wright, C. J., McComb, J., Tobriner, J., Mosk, J., Clark, J., and Burke, J.,\* concurred.

---

trial and is not made relevant to rebut testimony of a prosecution witness touching on that issue; rather defendant's proper remedy was a timely objection to the admission of such testimony by the prosecution witness. Defendant did not so object.

\*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.