Frederick M. MILLER, M.D., Petitioner,

v.

The DISTRICT COURT In and For the CITY AND COUNTY OF DENVER and the Honorable Leonard Plank, One of the Judges Thereof, Respondents.

No. 87SA49.

Supreme Court of Colorado,
En Banc.

May 26, 1987.

Larry Pozner & Associates, P.C., Shelley Gilman, Denver, for petitioner.

Norman S. Early, Jr., Dist. Atty., Second Judicial Dist., Donna Skinner Reed, Deputy Dist. Atty., Denver, for respondents.

Richard F. Hennessey, Ted D. Gardenswartz, Denver, for amici curiae Colorado Psychiatric Society & The Denver Psychoanalytic Society.

Charles G. Michaels, Denver, for amicus curiae Civil Liberties Union Foundation of Colo., Inc.

Michael L. Bender, Mary J. Mullarkey, Denver, for amicus curiae Nat. Ass'n of Criminal Defense Lawyers.

Richard A. Hostetler, Denver, for amicus curiae Colorado Criminal Defense Bar.

ERICKSON, Justice.

The respondent district court issued a contempt citation against the petitioner, Frederick Miller, when he refused to answer questions relating to murder charges against the defendant, Lawrence Aoki. We issued a rule to show cause, and now discharge the rule in part and make the rule absolute in part.

## I.

In February 1986, the defendant, Lawrence Aoki, was charged in the Denver District Court with two counts of murder in the first degree, section 18–3–102, 8B C.R.S. (1986), and two counts of mandatory sentence for a violent crime, section 16–11–309, 8B C.R.S. (1986). The charges arose out of the defendant's commission of two homicides on February 6, 1986, while he was allegedly suffering from a cocaine-induced mental disorder. The Colorado State Public Defender's Office was appointed to represent Aoki.

After the defendant was arrested, the Public Defender's office retained Dr. Frederick Miller, a psychiatrist, to perform a mental status evaluation of Aoki. The primary purposes of the examination and consultation were to determine the feasibility of a mental status defense and to advise defense counsel on trial tactics and strategy. Dr. Miller met with Aoki and advised him that his evaluation was protected by the attorney-client privilege, section 13–90–107(1)(b), 6 C.R.S. (1986 Supp.), and that any statements made during the evaluation would remain confidential until Aoki waived the privilege. After the evaluation, Dr. Miller reported his impressions and advice to defense counsel. Dr. Miller did not prepare a written report.

Aoki entered a plea of not guilty by reason of insanity, section 16–8–103, 8A C.R.S. (1986). While preparing for trial, the prosecution determined through an examination of jail records that Dr. Miller visited Aoki. Predicting that he would be a witness, the prosecution moved to endorse Dr. Miller as a witness at Aoki's upcoming sanity trial. On September 11, 1986, the district court permitted the endorsement

over the objection of defense counsel. Defense counsel thereafter filed a "Petition for Relief Pursuant to [C.A.R.] 21," and sought an order prohibiting endorsement of Dr. Miller as a prosecution witness. We denied the petition.

On September 15, 1986, trial began on the issue of Aoki's sanity at the time of the commission of the offense. The district court denied Dr. Miller's motion to quash the prosecution subpoena, and Dr. Miller sought relief in this court pursuant to C.A.R. 21. We issued a rule to show cause, but ultimately discharged the rule pursuant to a motion filed by the prosecution. In the motion, the prosecution advised this court that Aoki's sanity trial had proceeded to a verdict without the testimony of Dr. Miller, and that the jury found the defendant sane. The prosecution therefore claimed that the "issue as to quashal [sic] of subpoenas [was] moot as there [was] no longer a case or controversy."

After we discharged the rule to show cause, the defendant entered a plea of not guilty by reason of impaired mental condition, section 16–8–103.5, 8A C.R.S. (1986). The prosecution again subpoenaed Dr. Miller to testify at a pretrial hearing on a motion to suppress and at the guilt phase of Aoki's trial. The purpose of the prosecution's intended examination was to establish the defendant's culpable mental state at the time of the commission of the crimes, and the voluntariness of incriminating statements made by the defendant after his arrest. Dr. Miller again moved to quash the subpoena, and the motion was denied by the trial court. Dr. Miller petitioned this court for an order requiring the district court to quash the subpoena. We denied the petition on January 15, 1987.

On February 9, 1987, a hearing was held on Dr. Miller's refusal to testify. The prosecution called Dr. Miller as a witness, and, in response to the prosecution's inquiry as to what Aoki told him regarding "the events of February 6, 1986, particularly as to [Aoki's] mental condition at that time," Dr. Miller declined "to answer any further questions about [his] examination of Mr. Aoki...." The district court entered an order of contempt against Dr. Miller, and imposed a fine of $100 per day until he agreed to testify. The district court later stayed execution of the fine pending resolution of this original proceeding.

Dr. Miller now petitions this court for an order under C.A.R. 21 compelling the district court to quash the subpoena of Dr. Miller and to vacate the contempt citation. We conclude that Dr. Miller could not be compelled at the February 9, 1987 hearing to disclose confidential statements made to him by the defendant, but hold that Dr. Miller's petition for an order requiring the court to quash the subpoena is premature.

## II.

We have never considered whether, absent a waiver, a defendant's disclosures to a defense-retained psychiatrist are protected by the attorney-client privilege. However, a majority of the courts that have addressed the question have held that such communications are protected from disclosure either under the attorney-client privilege or the sixth amendment to the United States Constitution. *See, e.g., United States v. Alvarez*, 519 F.2d 1036 (3d Cir. 1975); *United States ex rel. Edney v. Smith*, 425 F.Supp. 1038 (E.D.N.Y.1976); *Houston v. State*, 602 P.2d 784 (Alaska 1979); *People v. Lines*, 13 Cal.3d 500, 119 Cal.Rptr. 225, 531 P.2d 793 (1975) [1]; *State v. Toste*, 178 Conn. 626, 424 A.2d 293 (1979); *State v. Pratt*, 284 Md. 516, 398 A.2d 421 (1979); *People v. Hilliker*, 29 Mich.App. 543, 185 N.W.2d 831 (1971);

---

**1.** The concurrence asserts that *People v. Lines*, 13 Cal.3d 500, 119 Cal.Rptr. 225, 531 P.2d 793 (1975), is inapposite because it is based on statutory authority different than Colorado's privilege statute. *See* concurrence at 842, *infra*. Quite to the contrary, the California Supreme Court's decision in *Lines* was based on the court's earlier decision in *City of San Francisco v. Superior Court*, 37 Cal.2d 227, 231 P.2d 26

(1951), which held, based upon a privilege statute identical in every material respect to Colorado's statute, that a client may submit to an examination of a defense-retained physician without fear that the latter will be compelled to reveal information disclosed to the physician. *See People v. Lines*, 13 Cal.3d at 510, 119 Cal. Rptr. at 23–32, 531 P.2d at 799–800. *Lines* is not inapposite.

*State v. Kociolek,* 23 N.J. 400, 120 A.2d 417 (1957); *Ballew v. State,* 640 S.W.2d 237 (Tex.Crim.App.1980). *But see, e.g., Noggle v. Marshall,* 706 F.2d 1408 (6th Cir.1983), *cert. denied,* 465 U.S. 1010, 104 S.Ct. 530, 78 L.Ed.2d 712 (1983).

Colorado's privilege statute, section 13–90–107(1)(b), 6 C.R.S. (1986 Supp.), provides:

> An attorney shall not be examined without the consent of his client as to any communication made by the client to him or his advice given thereon in the course of professional employment; nor shall an attorney's secretary, paralegal, legal assistant, stenographer, or clerk be examined without the consent of his employer concerning any fact, the knowledge of which he has acquired in such capacity.

**2.** Contrary to the concurrence's suggestion (pg. 842, *infra*), the privilege statute, section 13–90–107(1)(b), 6 C.R.S. (1986 Supp.), is a codification of the common law attorney-client privilege. *See People v. Swearingen,* 649 P.2d 1102, 1104 (Colo.1982).

**3.** Because the attorney-client privilege prevents an attorney's "secretary, paralegal, legal assistant, stenographer, or clerk" from being examined concerning "any fact, the knowledge of which he has acquired in such capacity," the concurrence apparently contends that communications to agents of defense counsel are not privileged unless the agent is "similar" to an attorney's secretary, paralegal, legal assistant, stenographer, or clerk. A similar argument was advanced by Chief Justice Pringle in his dissent to *Bellman v. District Court,* 187 Colo. 350, 531 P.2d 632 (1975), and did not prevail. We reject it in this case as well.

The purpose of extending the privilege to certain members of an attorney's staff is to prevent an adverse party from examining third persons who typically might overhear or gain knowledge of a client's communications to an attorney. *City of San Francisco v. Superior Court,* 37 Cal.2d 227, 231 P.2d 26 (1951). The purpose is not, as the concurrence suggests, to describe the sum total of agents to whom the privilege applies. The distinction was ably described by Justice Traynor in *City of San Francisco v. Superior Court:*

> The statute specifically extends the client's privilege to preclude examination of the attorney's secretary, stenographer, or clerk regarding information of communications between attorney and client acquired in such capacities, to rule out the possibility of their coming within the general rule that the privilege does not preclude the examination of a third per-

The attorney-client privilege extends to confidential communications by or to the client in the course of gaining counsel, advice, or direction with respect to the client's rights or obligations.[2] *Losavio v. District Court,* 188 Colo. 127, 133, 533 P.2d 32, 35 (1975); *Denver Tramway Co. v. Owens,* 20 Colo. 107, 128, 36 P. 848, 855 (1894). Although section 13–90–107(1)(b) does not by its terms protect disclosures to a defense-retained psychiatrist, we have held that the privilege may be applied to communications between the client and agents of his attorney.[3] *See Bellman v. District Court,* 187 Colo. 350, 531 P.2d 632 (1975) (statements made to an insurance investigator are privileged); *A. v. District Court,* 191 Colo. 10, 21, 550 P.2d 315, 324 (1976) (in order to come within the protection of the attorney-client privilege, there

son who overhears or otherwise has knowledge of communications between a client and his attorney. It does not follow, however, that intermediate agents of communication between attorney and client fall within that general rule. Had [the client] himself described his condition to his attorneys there could be no doubt that the communication would be privileged and that neither the attorney nor [the client] could be compelled to reveal it, even though a client is not listed in section 1881(2) among those who cannot be examined. It is no less the client's communication to the attorney when it is given by the client to an agent for transmission to the attorney, and it is immaterial whether the agent is the agent of the attorney, the client, or both. The client's freedom of communication requires a liberty of employing other means than his own personal action. The privilege of confidence would be a vain one unless its exercise could be thus delegated. A communication, then, by *any form of agency* employed or set in motion by the client is within the privilege.

. . . .

Thus, when communication by a client to his attorney regarding his physical or mental condition requires the assistance of a physician to interpret the client's condition to the attorney, the client may submit to an examination by the physician without fear that the latter will be compelled to reveal the information.

37 Cal.2d at 236–37, 231 P.2d at 30–31 (emphasis in original and citations omitted). The concurrence's restricted view of the agency doctrine is both out of step with the longstanding prevailing view, see text at pg. 838, and represents a serious impediment to a client's candid communications with anyone other than the attorney or certain members of his staff.

must be a communication between the client and his attorney or the attorney's agent), *cert. denied*, 429 U.S. 1040, 97 S.Ct. 737, 50 L.Ed.2d 751 (1977). *See also Kay Laboratories, Inc. v. District Court*, 653 P.2d 721, 723 (Colo.1982). The agency rule recognizes that the complexities of practice prevent attorneys from effectively handling clients' affairs without the help of others. The assistance of these agents "being indispensable to [the attorney's] work ..., the privilege must include all persons who act as the attorney's agents." 8 J. Wigmore, *Wigmore on Evidence* § 2301, at 583 (1961). *See also* 2 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 503(a)(3)[01], at 503–27 to –28 (1986); *United States v. Kovel*, 296 F.2d 918 (2d Cir.1961); *People v. Lines*, 13 Cal.3d 500, 119 Cal.Rptr. 225, 531 P.2d 793 (1975); *City of San Francisco v. Superior Court*, 37 Cal.2d 227, 231 P.2d 26 (1951); *People v. Ryan*, 30 Ill.2d 456, 197 N.E.2d 15 (1964); *Asbury v. Beerbower*, 589 S.W.2d 216 (Ky. 1979). It is now settled that a psychiatrist retained by defense counsel to assist in the preparation of the defense is an agent of defense counsel for purposes of the attorney-client privilege. *See, e.g., People v. Lines*, 13 Cal.3d 500, 119 Cal.Rptr. 225, 531 P.2d 793 (1975); *State v. Pratt*, 284 Md. 516, 398 A.2d 421 (1979); *Ballew v. State*, 640 S.W.2d 237 (Tex.Cr.App.1982). *See also* Criminal Justice Mental Health Standards § 7–3.3(b), commentary at 7–85 (1984).

■ In this case, the trial court found that Dr. Miller was hired by defense counsel to examine the defendant and to assist counsel in entering a plea and preparing for trial. Because Dr. Miller is an agent of defense counsel who was retained for the purposes of providing a psychiatric evaluation of the defendant's condition, the defendant's confidential communications to him were privileged under section 13–90–107(1)(b). Absent a waiver, Dr. Miller could not be held in contempt at the February 9, 1987 hearing for his refusal to reveal the content of those communications. *Thrap v. People*, 192 Colo. 341, 345, 558 P.2d 576, 578 (1977).

The prosecution claims that the defendant impliedly waived the attorney-client privilege by placing his mental condition in issue. We disagree, as have the majority of courts that have considered the question. *See, e.g., United States v. Alvarez*, 519 F.2d 1036 (3d Cir.1975); *Houston v. State*, 602 P.2d 784 (Alaska 1979); *People v. Lines*, 13 Cal.3d 500, 119 Cal.Rptr. 225, 531 P.2d 793 (1975); *State v. Pratt*, 284 Md. 516, 398 A.2d 421 (1979); *State v. Kociolek*, 23 N.J. 400, 129 A.2d 417 (1957). *But see People v. Edney*, 39 N.Y.2d 620, 385 N.Y.S.2d 23, 350 N.E.2d 400 (1975).[4]

■ A waiver of the attorney-client privilege may be express or implied, and the burden of establishing a waiver is on the party seeking to overcome the privilege. *Clark v. District Court*, 668 P.2d 3, 8 (Colo.1983). An implied waiver must be supported by evidence showing that the privilege holder, by words or conduct, has impliedly forsaken his claim of confidentiality with respect to the communication in question. *Id.*

In this case, the defendant's assertion of a mental status defense alone does not fairly indicate an implied waiver of the privilege. "Only a foolhardy lawyer would determine tactical and evidentiary strategy in a case with psychiatric issues without the guidance and interpretation of psychiatrists and others skilled in the field." *United States ex rel. Edney v. Smith*, 425 F.Supp. 1038, 1047 (E.D.N.Y.1976), *aff'd*, 556 F.2d 556 (2d Cir.), *cert. denied*, 431 U.S. 958, 97 S.Ct. 2683, 53 L.Ed.2d 276 (1977). Defense counsel should not run the risk that a psychiatrist who is consulted to prepare for trial may be forced to become an involuntary prosecution witness. A psychiatrist cannot form an opinion without inquiring about the defendant's mental condition and the facts surrounding the alleged crime. The defendant has a right to

---

**4.** *People v. Edney*, 39 N.Y.2d 620, 385 N.Y.S.2d 23, 350 N.E.2d 400 (1975), upon which the concurrence relies, represents the clear minority view and has been sharply criticized by the American Bar Association as "confused" and "unpersuasive." *See* Criminal Justice Mental Health Standards § 7–3.3, commentary at 7–85, 7–86 n. 20 (1986).

require the prosecution to investigate its own case, *see United States v. Wright,* 489 F.2d 1181, 1185 (D.C.Cir.1973); *State v. Pratt,* 284 Md. 516, 524, 398 A.2d 421, 426 (1979), and legitimately may expect that disclosures made to the psychiatrist will not be used as evidence for the prosecution. *United States v. Alvarez,* 519 F.2d 1036, 1047 (3d Cir.1975).

If, as the prosecution urges, the defendant's claim of impaired mental condition creates a waiver of his right to assert the attorney-client privilege as to disclosures made to a defense-retained psychiatrist, defense counsel's ability to prepare a mental status defense would be materially curtailed. The utility and efficacy of psychiatric examination is dependent in great part upon the defendant's ability to communicate freely and confidentially with his examining doctor, and the rule proposed by the prosecution would chill the defendant's dialogue with a psychiatrist retained by defense counsel to assist in the defense. Psychiatric consultation is, in many cases, one of the "raw materials integral to the building of an effective defense," *Ake v. Oklahoma,* 470 U.S. 68, 77, 105 S.Ct. 1087, 1094, 84 L.Ed.2d 53 (1985), and psychiatry has come to play a "pivotal role" in criminal proceedings where the defendant's mental condition is in issue. *Id.* at 79, 105 S.Ct. at 1095. As the Court in *Ake* stated:

> *[W]hen the State has made the defendant's mental condition relevant to his criminal culpability and to the punishment he might suffer, the assistance of a psychiatrist may well be crucial to the defendant's ability to marshal his*

*defense.* In this role, psychiatrists gather facts, both through professional examination, interviews, and elsewhere that they will share with the judge or jury; they analyze the information gathered and from it draw plausible conclusions about the defendant's mental condition, and about the effects of any disorder on behavior; and they offer opinions about how the defendant's mental condition might have affected his behavior at the time in question.

*Id.* at 80, 105 S.Ct. at 1095 (emphasis added).

 A waiver based solely on the defendant's assertion of a mental status defense seriously compromises the attorney's consultation with a psychiatrist retained to assist in the defense, and frustrates the policy underlying the attorney-client privilege to insure "candid and open discussion by the client to the attorney without fear of disclosure." *Losavio v. District Court,* 188 Colo. 127, 132, 533 P.2d 32, 34 (1975). The prosecution's examination of Dr. Miller was conducted in a vacuum, and there is nothing at the February 9, 1987 hearing, other than the defendant's claim of impaired mental condition, upon which to base a waiver. Dr. Miller was not questioned in the context of an adversarial proceeding, but rather at a pretrial hearing that was designed to provide a basis for presenting the issue to this court in an original proceeding. Based on the limited record before us, the defendant did not by words or conduct forsake his claim of confidentiality and impliedly waive the privilege.[5] The

---

5. Our opinion is consistent with the Criminal Justice Mental Health Standards § 7–3.3 (1984), promulgated by the American Bar Association. Standard 7–3.3(b) provides:

(b) *Uses of disclosures.* Whenever a mental health or mental retardation professional conducts an evaluation of defendant's mental condition upon the request or motion of the defense, all disclosures made by defendant or the attorney during the course of the evaluation are protected by the attorney-client privilege. As to that evaluation only, the privilege is waived to the extent that discovery is permitted by standard 7–3.8(b), if:

(i) defendant gives notice pursuant to standard 7–6.3 of an intention:

(A) to raise an issue concerning defendant's mental condition at the time of the alleged crime, and

(B) to introduce the testimony of the mental health or mental retardation professional who conducted the evaluation to support the defense claim on this issue; or,

(ii) defendant calls another mental health or mental retardation professional as an expert witness concerning defendant's mental condition at the time of the alleged crime, and the prosecution establishes, to the court's satisfaction, that in bad faith the defendant secured evaluations by all available qualified mental health or mental retardation professionals in the area thereby depriving the pros-

district court's contempt order was in error, and the court is hereby ordered to vacate the finding of contempt.[6]

### III.

■ Although Dr. Miller could not be compelled at the February 9, 1987 hearing to disclose privileged information, we cannot rule on the record before us that the subpoena must be quashed. A party seeking to invoke the original jurisdiction of this court must establish circumstances justifying the exercise of this court's power under C.A.R. 21. *Groendyke Transportation, Inc. v. District Court,* 140 Colo. 190, 194, 343 P.2d 535, 537 (1959). The burden is on the petitioner to establish clearly that the respondent court is proceeding without or in excess of its jurisdiction, or that the court has abused its discretion. *Brewer v. District Court,* 655 P.2d 819, 820 (Colo. 1982).

The record in the district court is not sufficient for us to determine whether the subpoena to Dr. Miller was proper. Dr. Miller alleges that the prosecution's subpoena violates the defendant's attorney-client privilege, and impinges upon the defendant's privilege against self-incrimination under the fifth amendment to the United States Constitution, his rights to effective assistance of counsel under the sixth amendment to the United States Constitution, and to due process under the state and federal constitutions. However, without a well-defined record detailing the posture, content, and purpose of the examination of Dr. Miller, and other matters relevant to the defendant's assertion of the attorney-client privilege and his constitutional privileges and rights, a decision of this court would be premature. After the defendant has presented his defense of impaired mental condition, if the prosecution wishes to call Dr. Miller as a rebuttal witness and the defendant objects to the questions posed to Dr. Miller, the court should consider the defendant's assertion of the attorney-client privilege and his constitutional privileges and rights, including the question of whether the defendant has waived the privilege or his constitutional rights. *See, e.g., Houston v. State,* 602 P.2d 784 (Alaska 1979) (although statements made by the defendant during a pretrial psychiatric examination are privileged, the privilege was waived where another defense witness relied on the former's report and the psychiatrist was called as a rebuttal witness); *State v. Tensley,* 249 N.W.2d 659 (Iowa 1977) (results of an examination of the defendant by a defense-retained psychiatrist are not privi-

---

ecution of the opportunity to obtain an adequate evaluation.

This standard does not preclude a mental health or mental retardation professional from disclosing the fact that the professional evaluated a named person upon defense request.

The commentary to standard 7–3.3(b) articulates several policy reasons justifying confidentiality:

1. Waiver of confidentiality would have a "chilling effect" upon a client's willingness to confide in counsel or defense consultants.
2. Inherent prejudice results if the trier of fact learns that a mental health or mental retardation professional originally was employed by the defense.
3. If waiver is recognized the defense in essence would assist the prosecution in discharging its burden of proof.
4. The defendant would be inhibited from consulting mental health or mental retardation professionals with conflicting views for fear of generating prosecution witnesses.
5. The defense would be inhibited from consulting any mental health or mental retarda-

tion professionals even though consultation might be crucial to the case.

*Id.,* commentary at 7–86.

6. The district court's entry of an order of contempt is invalid for other reasons. First, the prosecution had no right to examine a defense-retained expert prior to trial in a hearing contrived to present a question to this court in an original proceeding, and to obtain discovery of confidential communications between the defendant and the psychiatrist. *See* Crim.P. 15 and 16(II). Second, the record discloses that the court, prior to finding Dr. Miller in contempt, did not order him to respond to the prosecution's examination. Absent evidence showing that the contemnor willfully disobeyed a specific and definite order of the court, contempt is not established. *People v. Lockhart,* 699 P.2d 1332 (Colo.1985); *United States v. Rylander,* 714 F.2d 996 (9th Cir.1983), *cert. denied,* 467 U.S. 1209, 104 S.Ct. 2398, 81 L.Ed.2d 355 (1984); *United States v. Powers,* 629 F.2d 619 (9th Cir.1980).

leged; the content of the psychiatric examination, if privileged, was waived when the psychiatrist testified); *State v. Mingo,* 77 N.J. 576, 392 A.2d 590 (1978) (defendant's right to effective assistance of counsel is subverted if an expert's report obtained for defense purposes is used by the prosecution at trial, unless the defendant signifies an intention to use expert testimony at trial); 2 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 503(a)(3)[01], at 503–27 to –28 (1986) (a client's disclosures to a non-testifying, defense-retained expert are privileged; observations, conclusions, and information derived from sources other than the client's communications are not privileged).

Accordingly, the rule is made absolute as to the trial court's order of contempt, and is discharged as to the propriety of the subpoena of Dr. Miller.

ROVIRA, J., concurs in the result only.

ROVIRA, Justice, concurring in the result only:

I agree with the majority that the contempt order against Dr. Miller must be vacated and that it is premature to quash the subpoenas to Drs. Miller and McDonald. However, since my reasons differ from at least some of those of the majority, I write separately.

I.

From the sketchy transcripts we have of the proceedings, it appears that the People wished to call Drs. Miller and McDonald at a suppression hearing on the admissibility of the defendant's confession, and at the trial. The hearing of February 9, 1987, however, was neither of those. Its sole purpose was, as the majority concedes, to stage a proceeding so that the issue of whether Drs. Miller and McDonald could be compelled to testify could be presented to this court for review in an original proceeding.[1]

Trial courts should not engage in such activity, and I do not believe that this court should give its blessing to such proceedings by addressing the merits of the claims "presented." Further, as the majority notes in its footnote five, even if the gross procedural irregularities were ignored, contempt was never properly established. The contempt issue in this case is determined in footnote five; the text of section II of the majority opinion is dicta.

One of the problems presented by hearing a "test case" is that a number of sub-issues may escape careful scrutiny. In section II of its opinion, the majority paints with a very broad brush, indeed. It offers no distinctions between a psychiatrist called at a suppression hearing, the purpose of which is to determine whether the defendant knowingly waived his *Miranda* rights prior to making a statement, the sanity phase of a trial, the guilt phase of a

1. After hearing a motion to quash the subpoenas on Drs. Miller and McDonald on December 12, 1986, the court ruled:

It would be my idea that the doctors could not be called to testify in the District Attorney's case in chief on the guilt phase. The only possible way that I would allow the doctors to testify is if the defendant put on evidence of a mental disease or defect which made him incapable of forming the mental state or the defendant put on testimony in a suppression hearing that the defendant could not voluntarily waive his constitutional rights as to self-incrimination.

At the hearing on December 17, 1986, the district attorney said, "We decided to subpoena the doctors for the motions hearing on the motion to suppress statements based on the issue of voluntariness." The court inquired of defense counsel if the defendant "intends to offer testi-

mony from experts regarding the defendant's mental state ...?" Defense counsel responded affirmatively. The court then ruled the state could call Drs. Miller and McDonald on that issue.

The parties then stipulated that, if called, the doctors would not testify "so that they may immediately go to the Supreme Court...." Defense counsel then moved to have the doctors stricken as witnesses for all purposes, and the motion was denied. The court then inquired, "Is there anything else we need to do to make sure that issue is properly before the [supreme] court?"

Dr. Miller then petitioned this court for a rule requiring the district court to quash the subpoena; we denied the petition. The hearing of February 9th was then held, at which Dr. Miller refused to answer the district attorney's questions and was held in contempt.

trial, or an attempt by the prosecution to obtain pretrial discovery of the advice given by a psychiatrist to defense counsel.

While section III of the majority opinion does imply the rule may be different when a psychiatrist is called in rebuttal after the defendant has placed his mental condition in issue, the majority does not provide an analysis which would make this difference important while simultaneously rendering the procedural posture of the case irrelevant.

Accordingly, I would vacate the finding of contempt, discharge the rule as to the subpoena of Dr. Miller, and require this case to proceed in an orderly manner. Absent the adoption of my resolution of this case, I think it appropriate to comment on the substance of the majority opinion.

## II.

The majority states it is "settled that a psychiatrist retained by defense counsel to assist in the preparation of the defense is an agent of defense counsel...." Maj. op. at 838. The majority's extension of the Colorado privilege statute, quoted at page 837 of the majority opinion, seems unwarranted. Privilege statutes are in derogation of the common law and should be narrowly construed. *Bellman v. Dist. Ct.*, 187 Colo. 350, 531 P.2d 632 (1975) (Pringle, C.J., dissenting). While the insurance investigator in *Bellman* may be similar enough to a clerk or stenographer to fall within the statute, an independent expert is not necessarily so. *See State v. Schneider*, 402 N.W.2d 779 (Minn.1987) (defense-retained psychiatrist is neutral expert employed to make an independent determination as to the defendant's sanity, and thus not an agent of the defense attorney); *State v. Craney*, 347 N.W.2d 668 (Iowa 1984) (defense-retained psychiatrist is a subcontractor, similar to a handwriting expert, not an agent, and may be called by either party), *cert. denied*, 469 U.S. 884, 105 S.Ct. 255, 83 L.Ed.2d 192 (1984).

Since we are interpreting a Colorado statute, I do not think it wise to simply follow the majority rule without examining the competing policy concerns involved.

The parties, bench, and bar deserve a thorough examination of this important issue—not merely adoption of the "majority" rule, which may be based on authorities significantly different from Colorado's section 13–90–107(1)(b).

Some of the authorities the majority relies on are inapposite to this case. For example, *State v. Kociolek*, 23 N.J. 400, 129 A.2d 417 (1957) (cited on page 838 of the majority opinion), was interpreting common law; there were no statutes involved. On the other hand, *People v. Lines*, 13 Cal.3d 500, 119 Cal.Rptr. 225, 531 P.2d 793 (1979) (cited by the majority on page 838), dealt with a California statute which defined the attorney-client privilege in language different from and broader than that used by the Colorado statute. In my view, none of these authorities are persuasive in interpreting the Colorado privilege statute, which expressly delineates persons that come within the attorney-client privilege.

*Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), quoted by the majority at page 839, dealt only with a defendant's right (under the federal Constitution) to have a psychiatrist appointed, at state expense, to conduct an examination *and present his findings to the jury*. Indeed, *Ake* directly or indirectly refers to the psychiatrist presenting his findings to the trier of fact no less than nine times in just two pages, *Ake*, 470 U.S. at 80–81, 105 S.Ct. at 1095–96, which is all the People appear to desire in this case.

The majority also relies on the American Bar Association's Criminal Justice Mental Health Standards [Standards] for the general proposition that the People may not call a psychiatrist originally retained by the defendant absent a waiver by the defendant. Maj. op. at 838, 836 n. 1. The majority states that its opinion is "consistent" with the standards. Maj. op. at 836 n. 1. When the Standards are viewed in context, I think the result the majority reaches is contrary to, rather than consistent with, them.

While the Standards do prohibit the People from calling defense-retained psychia-

trists, they also require that the People be allowed contemporaneous psychiatric evaluations of the defendant. Standard 7–3.-4(a) requires the defendant to notify the state within forty-eight hours of beginning his own psychiatric examination. Standard 7–3.4(c) provides that if the court determines that an adequate evaluation of the defendant's mental condition has been precluded because the defendant has refused to cooperate with the mental health professional the court, in its discretion, may exclude the introduction at trial of testimony by a mental health professional offered by the defendant concerning the defendant's mental condition.

The commentary to Standard 7–3.4(c) states in part:

> Paragraph (c) of the standard endorses an intermediate response. It does not bar noncooperating defendants from asserting defenses based on their mental condition at the time of an alleged crime, but instead allows courts to exclude mental health or mental retardation professional testimony in support of the defense claim. This rule of reciprocity places in balance the prosecution and defense evidence, because a defendant's personal testimony, the testimony of lay witnesses, and other relevant nonexpert evidence may be used by either side to establish or refute the defense claim. Most appellate courts in fact have endorsed the reciprocity approach [footnote citation to authority]....

Standards, commentary to 7–3.4, at 7–95 and 7–96. Thus the Standards, when viewed as a whole, require a balance: either both sides have timely expert assistance or neither side does.

However, in Colorado the defendant need not notify the People that his mental condition is an issue until he enters a plea of not guilty by reason of insanity or asserts the affirmative defense of impaired mental condition, sections 16–8–103 and 103.5, 8A C.R.S. (1986), which may be months after his own experts have completed their eval-

uations. Even then, he does not have to cooperate with the People's experts. Section 16–8–106(2), 8A C.R.S. (1986) (defendant shall have a privilege against self-incrimination during evaluation). The strongest sanction for failing to cooperate is notice to the jury that he did not do so. *Id.*[2]

These statutes, when coupled with the court's extension of the attorney-client privilege to persons the legislature did not mention in the attorney-client privilege statute, allow the defendant to avoid informing the People for months, not cooperate with the court-appointed experts, and then present his own expert testimony without fear of meaningful response by the People. I do not find the majority opinion at all consistent with the even-handed approach of the Standards.

In this case, the defendant's experts (including Drs. Miller and McDonald) examined the defendant within days or weeks of the murder. The People had no way of knowing a psychiatric examination might be necessary until the defendant pled not guilty by reason of insanity some four months later. The court-appointed experts did not get a chance to examine the defendant until five months after the event. Clearly, the fact that the court-appointed psychiatrists did not examine the defendant until five months after the defendant's own experts had completed their examinations put them at a disadvantage.

The People also contend in their brief that the defendant did not cooperate with Dr. Metzner, one of the court-appointed experts. Even if the defendant had been cooperative in this case, however, that is no guarantee that another defendant would be. The majority decision does not provide an exception where the defendant is non-cooperative. The majority states that the prosecution must "investigate its own case," maj. op. at 838; however, it does not explain how the People can accomplish

---

**2.** Section 16–8–106(3) provides that if the defendant refuses to cooperate a court-appointed psychiatrist may render an opinion based on confessions, admissions, other evidence sur-

rounding the crime, known medical evidence, and the social history of the defendant. Again, this is a poor substitute for the timely, thorough examination provided for in the Standards.

that task if the defendant refuses to cooperate with a court-appointed psychiatrist.

Even assuming that a defense-retained psychiatrist is included within the attorney-client privilege, many courts have held that entry of an insanity plea and putting on psychiatrists to testify as to that issue waives the privilege. *See Noggle v. Marshall*, 706 F.2d 1408 (6th Cir.1983) (guarantee of effective counsel does not insulate from disclosure, on the issue of defendant's sanity, the opinion of a medical expert who was retained by the defense as a potential witness); *State v. Schneider*, 402 N.W.2d 779 (Minn.1987); *State v. Dodis*, 314 N.W.2d 233 (Minn.1982); *State v. Carter*, 641 S.W.2d 54 (Mo.1982), *cert. denied*, 461 U.S. 932, 103 S.Ct. 2096, 77 L.Ed.2d 305 (1983); *People v. Edney*, 39 N.Y.2d 620, 385 N.Y.S.2d 23, 350 N.E.2d 400 (1976); *Granviel v. State*, 552 S.W.2d 107 (Tex.Cr. App.1976), *cert. denied*, 431 U.S. 933, 97 S.Ct. 2642, 53 L.Ed.2d 250 (1977) (no attorney-client privilege attaches to communication between a defendant and a psychiatrist who makes an examination with respect to sanity).[3] The cases reason that the defendant is not free to present the experts who will testify most favorably to him on the sanity issue and then block the other experts by invoking a privilege. In this case, the defendant has previously entered such a plea and put on his own psychiatric experts. In addition, he has asserted the affirmative defense of impaired mental condition.

I agree that the subpoenas may not be quashed at this stage. Again, however, I do not think the court should render an advisory opinion on the subject, suggesting, as it does, that the People must wait until their rebuttal case at trial, as opposed to the suppression hearing, to attempt to call Drs. Miller and McDonald.

---

**3.** The New York rule announced in *Edney* and the Texas rule announced in *Granviel* were upheld in habeas corpus challenges. *See Edney v. Smith*, 425 F.Supp. 1038 (E.D.N.Y.1976), *aff'd without opinion*, 556 F.2d 556 (2d Cir.1977); *Granviel v. Estelle*, 655 F.2d 673 (5th Cir.1981), *cert. denied*, 455 U.S. 1003, 102 S.Ct. 1636, 71 L.Ed.2d 870.