[No. S012628. Mar. 18, 1991.]

DAVID ERIC BROCKWAY, Petitioner, v.
THE STATE BAR OF CALIFORNIA, Respondent.

54

**COUNSEL**

Pansky & Markle and Ellen A. Pansky for Petitioner.

Diane C. Yu, Richard J. Zanassi and Carole Hann for Respondent.

**OPINION**

**THE COURT.**—We review the recommendation of the State Bar Court that petitioner David Eric Brockway be suspended from the practice of law for one year, that execution of the order be stayed, and that petitioner be placed on probation for two years on various conditions, including actual suspension for three months.[1]

We uphold the State Bar Court's findings that petitioner misappropriated funds from one set of clients, and acquired an adverse interest in another client's property without following pertinent disclosure and consent requirements. However, we do not agree with the State Bar Court that petitioner was operating under a "good faith" belief that the misappropriated funds were payment for services rendered. We also depart from the State Bar Court's ambiguous findings on the "adverse interest" charge. We independently conclude that petitioner acquired such an interest by accepting, as part of a fee agreement, a quitclaim deed to property valued at an amount greater than the agreed-upon fee.

For reasons which will be explained, we adopt the recommended discipline.

## I. BACKGROUND

Petitioner was admitted to the Iowa bar in 1972 and to the California bar in 1977. He has no prior record of discipline in California or, apparently, in Iowa.

---

[1] The review department adopted the findings and conclusions of the hearing referee by an eight-to-zero vote (three members abstaining).

The instant six-count notice to show cause was served in January 1986. Several counts and allegations were dismissed by the hearing referee upon motion of respondent or stipulation of the parties. The State Bar Court ultimately found, and respondent does not dispute, that other allegations were not sustained by clear and convincing evidence. As a result, only two counts are at issue here: (1) count 2, insofar as it alleges and the State Bar Court found that petitioner mishandled client funds in the Messenger matter (former rule 8-101, Rules Prof. Conduct),[2] and (2) count 6, insofar as it alleges and the State Bar Court found that petitioner improperly acquired an interest adverse to the client in the Jones matter (rule 5-101). The hearing took place over a 10-day period in 1987.

## II. THE MESSENGER MATTER

A. *Evidence*

David and Joy Messenger's home was foreclosed upon in early 1981. Charles Powell, a foreclosure consultant, referred them to petitioner. We note that Powell did not testify at the disciplinary hearing, but that David, Joy, and petitioner did.

It is undisputed that in June 1981, petitioner agreed to represent the Messengers. He quoted fees for various services, e.g., $300 to determine whether the foreclosure sale was defective, a $2,500 retainer to challenge the sale in court, and $285 to file a bankruptcy petition. The Messengers gave petitioner a $300 check. For reasons not pertinent here, they believed that Powell could be entrusted with money and instructions intended for petitioner.

Over the next month and a half, confusion evidently arose over the amount of fees owed. The Messengers testified that they stopped payment on the $300 check, and gave Powell a total of $785 in cash as payment for petitioner's fees. Petitioner testified that he never received the money but performed certain services, i.e., he reviewed the records of the foreclosure sale, determined that it was lawful and that the Messengers were owed a "refund," and prepared a refund claim.

In early August 1981, Powell told the Messengers that the house had been "lost" and that they should buy it back from the new owner, Mendoza. Joy testified that on August 13, she met with Powell and prepared a real

---

[2] We refer to the former Rules of Professional Conduct (rules) as they existed at the time the instant misconduct occurred. This court subsequently approved comprehensive rule revisions, operative May 27, 1989 (new rules).

estate purchase contract and deposit receipt (deposit receipt). A copy of the deposit receipt, signed by both David and Joy, is included in our record. It says, among other things, that "David Brockway is authorized to negotiate" the purchase of the house from Mendoza. It also says that the Messengers issued a "personal check payable to David Brockway, *Escrow Trust Acct. to be held uncashed until acceptance of this offer, as deposit on account of* [*the*] *purchase price.*" (Italics added.) Joy testified that she gave Powell a $500 check made payable to "David Brockway *Escrow*" which petitioner was authorized to give to Mendoza along with the deposit receipt. (Italics added.)

Joy testified that she did not recall having any conversations with petitioner after the deposit receipt was prepared.

In contrast, petitioner testified that he found the $500 "David Brockway Escrow" check in his office, along with a note asking him to "negotiate with Mendoza for the Messengers." According to petitioner, no deposit receipt was attached. He immediately phoned Joy and asked her "what was going on." She asked him to negotiate a purchase price with Mendoza. Petitioner "figured" the $500 check was payment for fees, i.e., "to make up for the $300 [check upon which the Messengers had stopped payment], plus [payment for unspecified] telephone calls." Petitioner then wrote on the face of the escrow check, "Fees for House re Mendoza," and deposited it in his own personal account.[3]

Petitioner explained that he then phoned and met with Mendoza once, and prepared a purchase contract that Mendoza never signed. Petitioner soon learned that the Messengers had hired another attorney, Lee, to handle the case. Petitioner sent Lee the Messengers' file. Lee testified that between September and November 1981, he twice told petitioner over the phone that his retention of the $500 was "in dispute," and that he "ought to return" the money to the Messengers. Because petitioner seemed "evasive," Lee sent him a letter, dated November 18, 1981, saying the Messengers had intended petitioner to use the $500 check as earnest money for Mendoza.

Petitioner testified that, while he did not recall the content of his conversations with Lee, it "seems likely" Lee demanded return of the $500.

---

[3] Petitioner relayed the phone conversation with Joy as follows: "I . . . asked her what was going on. And she told me that she was in negotiation with Mr. Mendoza, or there was supposed to be an escrow opened to purchase the house back. [¶] And I said, '[W]hat do you want me to do?" [¶] And she said, '[C]ould you contact him because I don't think we [should pay the price Mendoza has quoted to Powell].' [¶] . . . And I said, '[Y]ou bounced your check, so I am not really interested in helping you.' . . . [¶] [S]he insisted. [¶] So I said, 'Fine, I'll contact him. You go raise the [purchase] money . . . . I will contact Mr. Mendoza and get him to agree on a price.' " Petitioner also testified that he told Joy he " 'would do *it* for $500,' " but did not specify what services he was referring to. (Italics added.)

Petitioner denied receiving Lee's letter, and said that the copy introduced at the hearing had been sent to the wrong address. To date, petitioner has retained the disputed $500.

### B. *Findings*

The State Bar Court found that all witnesses in the Messenger matter were "credible," and that there had been a genuine "misunderstanding" over the $500 check; the Messengers viewed it as earnest money for Mendoza, while petitioner erroneously believed it was payment for past due fees. The State Bar Court concluded that petitioner "inadvertently"—not "wilfully"—misappropriated the money under rule 8-101(A).[4] It further determined that the misunderstanding had been "rectified" by Attorney Lee's demand for the money, and that petitioner wilfully failed to comply in violation of rule 8-101(B)(4).[5] The State Bar Court recommended that petitioner be ordered to pay restitution to the Messengers in the amount of $500, plus interest at the legal rate from August 13, 1981.

### C. *Analysis*

■   Petitioner does not vigorously dispute that he violated rule 8-101(B)(4) by failing to return the Messengers' money on demand. He argues, however, that the State Bar Court erred in finding him culpable of misappropriation under rule 8-101(A), because he actually and reasonably believed the money belonged to him. We agree the findings are ambiguous insofar as they cite petitioner for "inadvertent" misappropriation. However, we independently find clear and convincing evidence that petitioner wilfully misappropriated the $500 check. (See *Maltaman v. State Bar* (1987) 43 Cal.3d 924, 932 [239 Cal.Rptr. 687, 741 P.2d 185].)

First, the record indicates that petitioner actually knew the $500 check was to be used solely as a deposit on the house. The check was made payable to an "escrow" account—a significant term of art implying that the money was not intended for petitioner's personal use. Petitioner's testimony that he never received the deposit receipt—the one document which unambiguously stated what the check was for—is inherently implausible. To

---

[4] Rule 8-101(A) provided: "All funds received or held for the benefit of clients by [an attorney], including advances for costs and expenses, shall be deposited in one or more identifiable bank accounts labelled 'Trust Account,' 'Client's Funds Account' or words of similar import . . . and no funds belonging to [the attorney] shall be deposited therein or otherwise commingled therewith . . . ."

[5] Rule 8-101(B)(4) required an attorney to "[p]romptly pay or deliver to the client as requested by a client the funds, securities, or other properties in the possession of [the attorney] which the client is entitled to receive."

credit petitioner's account, we would have to believe that: (1) Joy was lying or mistaken when she testified that the check and deposit receipt were simultaneously given to Powell for use by petitioner in negotiations with Mendoza, or (2) Powell, a professional consultant in such matters, delivered the check and a note authorizing such negotiations, but failed to deliver the deposit receipt. Both scenarios are improbable. Moreover, a reasonable attorney operating under a good faith but mistaken belief that the money belonged to him would not have ignored the client's demand for its return.

Second, any belief that the check was payment for legal services was highly unreasonable. For this additional reason, petitioner's misappropriation must be deemed "wilful." (Cf. *Coppock* v. *State Bar* (1988) 44 Cal.3d 665, 681 [244 Cal.Rptr. 462, 749 P.2d 1317]; *Palomo* v. *State Bar* (1984) 36 Cal.3d 785, 795-796 [205 Cal.Rptr. 834, 685 P.2d 1185].) As noted, the check was made payable to an "escrow" account, not simply to petitioner or his law firm. There was no evidence that petitioner believed the Messengers knew how much was owed in past fees or how much he intended to charge for negotiations with Mendoza. More importantly, petitioner implicitly conceded that he never asked the Messengers what they wanted him to do with the *check*; his phone inquiry to Joy only concerned the *services* she wanted him to perform. Petitioner knew he was expected to negotiate a purchase of the house, and it is customary for prospective purchasers of real estate to include an earnest-money deposit with their offer. At the very least, petitioner was grossly negligent in failing to ascertain whether the check was to be used in the negotiations.

For the foregoing reasons, we hold that petitioner wilfully violated rule 8-101(A) and 8-101(B)(4) in the Messenger matter.

### III. THE JONES MATTER

A. *Evidence*

In June 1982, Earl Preston Jones was charged with multiple murder. Jones spoke with petitioner and his law partner, Gladys Towles Root, in jail and agreed, over the course of three visits, to retain them as trial counsel.

Specifically, on June 14, Jones expressed interest in retaining the pair and using his house to finance attorney fees. On June 16, Jones signed: (1) a handwritten retainer agreement prepared by Root,[6] (2) a deed quitclaiming his house to petitioner, doing business as the "Secure Defense Company,"

---

[6]The handwritten agreement was lost or destroyed before the disciplinary hearing. All other documents mentioned herein are included in our record.

and (3) a document giving petitioner a general power of attorney. On June 18, Jones and his ex-wife, Marcia Fuller, signed a printed "contract of hire" stating that Jones would pay petitioner and Root a "retainer fee" of $10,000, "with a balance to be quoted" and "secured by T. D. [presumably 'trust deed'] cash down to be arranged . . . plus all costs [of] financing [the] Trust Deed or Grant Deed."

At one point in the disciplinary hearing, petitioner testified[7] that the following events occurred when the contract and deed were signed: Jones read and did not question the documents. The parties orally agreed that the $10,000 retainer was payable "immediately" by means of a "loan" against Jones's property. According to petitioner, no further discussion of the loan occurred at this time because: (1) its terms were apparent from "the face of" the quitclaim deed and contract, (2) petitioner believed Jones understood the significance of these documents, and (3) Jones said he was discussing the transaction with another attorney. Petitioner advised Jones to discuss the transaction with both his family and an attorney. Petitioner also told Jones that the power-of-attorney form authorized petitioner to "conduct business" on Jones's behalf.

However, at another point in the State Bar hearing, petitioner testified that the house belonged to him "outright" under the retainer contract and deed.[8] Petitioner explained that he was authorized to sell the house immediately, apply $10,000 of the proceeds to the retainer fee, place any balance in his client trust account, and make withdrawals as additional fees were earned.

Root handled the preliminary hearing and made most other pretrial appearances until her death on December 21, 1982.

Over the next year, confusion evidently arose in the criminal case over the meaning of the fee agreement. We highlight only the facts relevant to the disciplinary determination and disclosed by the instant record.

Petitioner testified that shortly after Root died, he obtained Jones's permission to represent him at trial, and to record the deed and "arrange for a loan." Petitioner recorded the deed on December 27, 1982.

An attorney, Gordon, testified that on February 28, 1983, she visited Jones in jail at petitioner's request. Jones told Gordon that he wanted to

---

[7] Jones and Fuller did not testify at the disciplinary hearing. Root died in 1982, long before the hearing took place.

[8] In petitioner's words, the contract and deed authorized him to do "whatever I want [with Jones's house]. It's transferred to me, its my property. It's my property today. . . . [¶] My house, my property."

personally obtain the loan, and asked that the "deed and papers" be returned to his ex-wife, Fuller. Gordon sent these instructions to petitioner in a note which he admittedly received on March 3, but ignored.

Meanwhile, pursuant to a written agreement dated March 2, 1983, one Obeji made a "personal loan" to petitioner in the amount of $25,000 to be repaid in one year, at an annual interest rate of 15 percent. The loan was secured, in part, by a grant deed to Jones's property. Obeji agreed not to sell, encumber, or transfer the property for one year. The deed—which makes no mention of the loan—was notarized on March 2, and recorded a week later. Petitioner testified that, at some unspecified point, Jones saw the loan agreement and deed, and had them reviewed by a real estate broker.

In May 1983, Jones told the State Bar that petitioner had misappropriated the house.

Over the next several months, Jones repeatedly moved to relieve petitioner as counsel in the criminal case. Transcripts of at least four of these hearings—June 14, July 11, July 15, and October 6, 1983—were admitted at the disciplinary hearing. The transcripts show that Jones accused petitioner of using a "forged" deed to sell the house without Jones's consent. The trial court consistently declined to litigate the fee dispute, but offered to appoint a public defender to replace petitioner. During or after each hearing, Jones engaged in off-the-record discussions with petitioner and/or a public defender about the fee dispute. After each discussion, Jones returned to court, indicated that the problem had been resolved, and asked that petitioner be allowed to continue as trial counsel. The court abided by this request at the four hearings listed above.

Of particular interest is State Bar testimony given by petitioner about off-the-record statements he made to Jones during a recess at the hearing on June 14, 1983. According to petitioner, he told Jones that he would transfer the house to new counsel, subject to a lien of $10,000. In the alternative, Jones "was informed that I [(petitioner)] considered the house mine if I was going to be his attorney and remain on the case[, and] [t]hat I would take my fees out of . . . the proceeds [from the] sale [of the house], and if my fees were less than [such] proceeds . . . , [Jones] would be given the balance." Jones purportedly approved the latter arrangement.

Also pertinent is an appearance by Howard Waco, a deputy public defender, at the hearing of July 15, 1983. Waco informed the trial court that he had separate off-the-record discussions with petitioner and Jones, and was convinced they had resolved the fee dispute. At the disciplinary hearing, petitioner attempted to ask Waco about statements Jones may have made concerning the fee arrangement. Waco refused to answer such questions, asserting the attorney-client privilege on Jones's behalf. Petitioner

objected and the State Bar referee overruled the objection for reasons that will be discussed later.

We also note that at the hearing of October 6, 1983, petitioner and Jones approved the trial court's suggestion that they arbitrate the fee dispute. Petitioner testified at the disciplinary hearing that he gave arbitration forms to Jones on January 24, 1984, told Jones that an arbitration hearing could be held in county jail, and offered to pay all administrative fees. Jones never signed the papers.

Petitioner testified that he ultimately repaid the Obeji loan. By quitclaim deed recorded May 16, 1984, the property was transferred from Obeji to Osborn, petitioner's financee.[9] Petitioner holds Osborn's power of attorney with respect to the property. Title is held this way, he explained, to protect it from any judgment that might be entered against him in various lawsuits filed after Root's death.

Petitioner represented Jones throughout the criminal trial, which included a competency phase, guilt and sanity phases, a penalty phase, and a motion for new trial. Petitioner estimated the reasonable value of his services at $150,000. He agreed with an estimate made by Jones in February 1983 that the house then had a fair market value of $110,000 and an equity value of $60,000. Petitioner has paid taxes on the property and received no rent from its tenant, Fuller. Other than the house, petitioner has received no compensation from Jones.

## B. *Findings*

The State Bar Court found that petitioner violated rule 5-101 in June 1982 by acquiring an unspecified interest in the house "adverse" to Jones without first fully disclosing the terms of the transaction in writing, giving Jones a reasonable opportunity to seek the advice of independent counsel, or obtaining Jones's written consent to the transaction.[10]

---

[9] Petitioner and Osborn were married at the time of the disciplinary hearing.

[10] Rule 5-101 prohibited an attorney from "knowingly acquir[ing] an ownership, possessory, security or other pecuniary interest adverse to a client unless (1) the transaction and terms in which the [attorney] acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing to the client in . . . [reasonably understandable] terms . . . , (2) the client is given a reasonable opportunity to seek the advice of independent counsel . . . , and (3) the client consents in writing thereto."

We note the State Bar Court did not find that the transaction was "unfair" to Jones within the meaning of the rule.

Contrary to a suggestion by petitioner, the State Bar Court also did not find that petitioner violated rule 5-101 by failing to inform Jones *in writing* to seek the advice of independent counsel. While the referee orally observed that this particular advisement was not given in writing, this fact was not mentioned in the written decision ultimately adopted by the review department. Rule 5-101 did not on its face impose such a requirement, but its successor—new rule 3-300—does.

## C. *Analysis*

■ Petitioner first argues that because rule 5-101 was not listed by number anywhere in the notice to show cause, he was denied a fair hearing. We disagree.

While we do not condone imprecise charging in disciplinary cases, this particular omission was harmless. (See e.g., *Maltaman* v. *State Bar, supra*, 43 Cal.3d 924, 950.) The full text of rule 5-101 was quoted almost verbatim in the body of count 6, the Jones matter. Petitioner never objected to introduction of evidence on lack-of-notice grounds, nor did he raise the issue in his midhearing motion to dismiss. Indeed, while arguing that the referee should dismiss count 6 for other reasons, petitioner conceded that it "speaks" in the "language of [rule] 5-101."[11] We see no fundamental defect in the notice provided to petitioner. (Cf. *Slavkin* v. *State Bar* (1989) 49 Cal.3d 894, 902-903 [264 Cal.Rptr. 131, 782 P.2d 270].)

■ Petitioner next insists the hearing was unfair because the attorney-client privilege was sustained as to statements Jones may have made to Waco about the fee agreement. (See Evid. Code, §§ 950-955; see also rule 556, Rules Proc. of State Bar.) Petitioner suggests here, as in his offer of proof below, that such statements bear on whether he adequately disclosed the terms of the agreement under rule 5-101, and whether Jones understood and consented to them. Petitioner maintains that, by complaining to the State Bar about the fee agreement, Jones waived the privilege insofar as it might otherwise apply to relevant communications with Waco. (Citing Evid. Code, § 958.)

Evidence Code section 958 creates an exception to the privilege for communications "relevant to an issue of breach, by the lawyer[,] . . . of a duty arising out of the lawyer-client relationship." Contrary to what petitioner claims, the statute is not a general client-litigant exception allowing disclosure of *any* privileged communication simply because it is raised in litigation. (*People* v. *Lines* (1975) 13 Cal.3d 500, 511 [119 Cal.Rptr. 225, 531 P.2d 793]; cf. Evid. Code, §§ 1016 [patient-litigant exception to the psychotherapist-patient privilege], 1020 [breach-of-duty exception to the psychotherapist-patient privilege].) Evidence Code section 958 only authorizes disclosure of relevant communications between a client (e.g., Jones) and an attorney charged with professional wrongdoing (e.g., petitioner). (*Schlumberger Limited* v. *Superior Court* (1981) 115 Cal.App.3d 386, 392-393 [171 Cal.Rptr. 413]; *Miller* v. *Superior Court* (1980) 111 Cal.App.3d 390, 392-393 [168 Cal.Rptr. 589].) This approach gives the attorney a meaningful

---

[11] No written motion to dismiss is included in our record. However, the reporter's transcript of the hearing indicates that petitioner moved to dismiss count 6 on grounds Attorney Waco had erroneously been allowed to assert the attorney-client privilege on Jones's behalf.

opportunity to defend against the charge, but does not deter the client from confiding in other attorneys (e.g., Waco) about the dispute. Since nothing in the record suggests Jones has otherwise waived the privilege as to confidential communications with Waco (see Evid. Code, § 912; *Southern Cal. Gas Co.* v. *Public Utilities Com.* (1990) 50 Cal.3d 31, 39-49 [265 Cal.Rptr. 801, 784 P.2d 1373]), no error occurred.

In any event, the referee's ruling almost certainly did not result in exclusion of favorable evidence. Petitioner gave extensive, direct testimony about the terms and circumstances of the fee agreement. The record suggests that Waco, an outsider to the agreement, knew little about it. While appearing before the criminal court on July 15, 1983, Waco noted that Jones "did not go into the details [of] his [financial] arrangements with M[s.] Root and [petitioner]." We reject petitioner's attack on the fairness of the disciplinary hearing.

■ Petitioner next argues that he did not acquire an *"ownership,* possessory, *security* or other pecuniary interest *adverse"* to Jones within the meaning of rule 5-101. (Italics added.) In the alternative, he insists that Jones's signature on the quitclaim deed and retainer contract satisfies the rule's requirement for written disclosure and consent. We agree with petitioner that the State Bar Court's findings are ambiguous as to the nature of the "adverse" interest he was found to have acquired. However, we independently reject his claims.

■ It is settled that rule 5-101 applies where an attorney secures payment of a fee by taking a promissory note secured by a standard deed of trust on a client's real property. (*Hawk* v. *State Bar* (1988) 45 Cal.3d 589, 598-601 [247 Cal.Rptr. 599, 754 P.2d 1096]; see also com. to new rule 3-300.) This arrangement gives the attorney a power of sale in a nonjudicial foreclosure proceeding. As explained in *Hawk*, the cases have long held that the safeguards imposed by rule 5-101 apply to any transaction permitting the attorney to "summarily extinguish" a client's property interest and "collect disputed fees" without prior "judicial scrutiny." (45 Cal.3d at p. 600.)[12]

Similar concerns are raised where, as here, the fee arrangement gives the attorney an ownership interest in client property that has a value greater

---

[12]Because these principles predate the instant misconduct, we reject petitioner's claim that application of rule 5-101 and *Hawk, supra,* 45 Cal.3d 589, would be impermissibly retroactive. At most, "the fact that we have not previously held that an attorney who takes a [quitclaim deed under these circumstances] automatically acquires an interest 'adverse' to his client, make[s] petitioner's conduct in this matter less reprehensible than would be a violation of a more clear-cut and well-established rule." (*Hawk, supra,* at p. 602.)

than the amount absolutely agreed upon in fees. ■ As conceded by petitioner at the disciplinary hearing, the quitclaim deed he accepted in June 1982 gave him immediate power to sell, encumber, or transfer Jones's property "outright." As a result, petitioner was in a position to "summarily extinguish" approximately $50,000 of Jones's equity interest in the property over and above the then agreed-upon fee (i.e., $60,000 equity minus $10,000 retainer fee). (*Hawk* v. *State Bar, supra,* 45 Cal.3d at p. 600.) Assuming he transferred the property to a bona fide purchaser, petitioner could have severed Jones's interest permanently.

Nothing in the quitclaim deed and retainer contract warned Jones of these consequences. Indeed, the two documents were contradictory. The deed effectively transferred an ownership interest to petitioner, while the contract suggested he was taking only a security interest. Moreover, the contract itself was ambiguous as to the type of security interest contemplated, i.e., whether petitioner was expected to hold the deed indefinitely as security for his entire fee, or use it immediately to secure a loan for payment of the retainer fee. These deficiencies are reflected in petitioner's conflicting descriptions of the agreement at the State Bar hearing. They also allowed him to present different interpretations of the agreement to Jones in the criminal case. Thus, at a minimum, petitioner violated rule 5-101 by failing to disclose in writing the nature of the adverse property interest he acquired and to obtain Jones's written consent.

### IV. APPROPRIATE DISCIPLINE

■ We exercise our own judgment in selecting the appropriate discipline, but place great weight on the State Bar Court's recommendation. (*Slavkin* v. *State Bar, supra,* 49 Cal.3d 894, 904.) The Standards for Attorney Sanctions for Professional Misconduct (Rules Proc. of State Bar, div. V) (Standards) also guide our determination. (*In re Lamb* (1989) 49 Cal.3d 239, 245 [260 Cal.Rptr. 856, 776 P.2d 765].) However, we may depart from the Standards where we have grave doubts as to their propriety under the particular circumstances. (*Lawhorn* v. *State Bar* (1987) 43 Cal.3d 1357, 1366 [240 Cal.Rptr. 848, 743 P.2d 908].)

■ At the outset, we note that the Standards were misapplied by the State Bar Court. Its disciplinary recommendation rested exclusively upon Standard 2.2(b), which states that violations of rule 8-101 *other than* those involving "wilful misappropriation" of client funds warrant "a three month actual suspension . . . irrespective of mitigating circumstances."

However, for reasons stated earlier, petitioner's misappropriation in the Messenger matter may properly be deemed "wilful" for disciplinary pur-

poses. Such misconduct is governed by Standard 2.2(a), which was not mentioned in the decision below. This Standard identifies the appropriate discipline as disbarment, but authorizes a minimum one-year actual suspension where the amount of misappropriated funds is "insignificantly small" or the "most compelling mitigating circumstances clearly predominate."

In addition, the State Bar Court failed to mention the more flexible provisions of Standard 2.8, applicable to petitioner's violation of rule 5-101 in the Jones matter. This Standard recommends suspension or reproval depending upon "the extent of the [attorney's] misconduct and the harm to the client . . . ."

Imposition of the minimum one-year period suggested by Standard 2.2(a) would be unduly harsh here. Petitioner has no disciplinary record in approximately 13 years of practice in this state and an additional 5 years in Iowa. (Std. 1.2(e)(i).) Similarly, the money and property obtained in both client matters roughly compensates him for services rendered. We have traditionally viewed lack of client harm as a mitigating factor. (Std. 1.2(e)(iii); *Arm* v. *State Bar* (1990) 50 Cal.3d 763, 779 [268 Cal.Rptr. 741, 789 P.2d 922].) Favorable character evidence also suggests petitioner is capable of rehabilitation. Four attorneys, one former client, and a retired Court of Appeal justice, Bernard S. Jefferson, testified that they were aware of the charges but believe petitioner is an honest and conscientious lawyer. (Std. 1.2(e)(vi).) Finally, application of rule 5-101 to these novel facts is a mitigating factor. (See fn. 12, p. 64, *ante.*)

The three-month actual suspension recommended below is appropriate for several reasons. We have doubts about petitioner's candor at the disciplinary hearing. His description of the circumstances under which he received the Messengers' money is artful and hard to believe. His conflicting testimony in the Jones matter raises similar concerns. (Std. 1.2(b)(vi).)

Petitioner also acted with indifference when confronted with his clients' legitimate complaints over fees. (Std. 1.2(b)(iii).) He has never explained to the Messengers his reasons for keeping their money. While petitioner seemed willing to arbitrate the fee dispute in the Jones matter, he failed to keep Jones informed in other ways. For example, petitioner did not respond to Jones's request that the deed be returned so that Jones could arrange for a loan. Petitioner also failed to adequately explain the Obeji loan to Jones beforehand, leading Jones to mistakenly believe that the property had been sold. And, petitioner did not tell Jones that judgment creditors might levy upon the property, and that this contingency influenced the manner in which title was conveyed to both Obeji and Osborn. Such facts are particu-

larly troubling in light of concerns about Jones's competence in the criminal case and his deep emotional attachment to the house.[13]

For the foregoing reasons, it is ordered that petitioner David Eric Brockway be suspended from the practice of law for one year, that execution of the suspension order be stayed, and that petitioner be placed on probation for two years subject to the terms and conditions adopted by the Review Department of the State Bar Court, including actual suspension for the first three months of the probationary period.

Petitioner is also ordered to take and pass the Professional Responsibility Examination given by the National Conference of Bar Examiners within one year of the effective date of this order.

Petitioner is also ordered to comply with the provisions of rule 955, paragraphs (a) and (c), of the California Rules of Court within, respectively, 30 and 40 days of the effective date of this order.

This order is effective upon the finality of this decision in this court. (See Cal. Rules of Court, rule 953(a).)

Petitioner's application for a rehearing by the Supreme Court was denied May 15, 1991.

---

[13] Dr. McCormack, a court-appointed psychologist in the criminal case, testified at the disciplinary hearing that Jones's personal sense of well-being was tied to the house, and that he was "paranoid" about losing it.